## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**JASON WEBB,**

    **Plaintiff,**          Civ. Action No. <u>2:19-cv-00447</u>

**v.**

**STEVEN L. PAINE, State Superintendent of Schools,
in his individual capacity and official capacity; and
JAN BARTH, Assistant State Superintendent of Schools,
in her individual capacity and official capacity,**

    **Defendants.**

## COMPLAINT

  Plaintiff Jason Webb, for his complaint against Defendants Steven L. Paine and Jan Barth, allege, by and through his attorneys, as follows:

### INTRODUCTION

  1.  This case is about the abuse of power. Top officials at the West Virginia Department of Education, Superintendent Steve Paine and assistant superintendent Jan Barth, have used their government power to threaten and intimidate a private citizen, Jason Webb, for exercising his First Amendment rights—specifically, for expressing his political views and advocating for a client and state vendor that Paine and Barth oppose. In this case, Paine and Barth threatened—on multiple occasions—a major education industry client of registered lobbyist Webb, the standardized testing company ACT, Inc.

  2.  Several times in 2018 and 2019, Paine himself called top ACT officials—and ultimately the CEO—to threaten them that if ACT did not stop Webb from publicly criticizing Paine's department or other vendors or education policies favored by Paine, or if ACT did not fire Webb as their lobbyist, Paine would ensure that ACT would never do business with the State of West Virginia again.

3.      Paine and Barth's inappropriate and retaliatory actions violate Webb's First Amendment rights and constitute tortious interference with Webb's business relationship with his client ACT.

4.      Webb has brought this case to protect his rights under the U.S. Constitution and West Virginia law and to put an end to the abuses of power at the West Virginia Department of Education that are occurring under Paine and Barth's corrupt leadership.

## PARTIES

5.      Plaintiff Jason Webb is a citizen of West Virginia and registered lobbyist. Webb conducts lobbying through Capitol Advocates, LLC, a West Virginia limited liability company of which Webb is the sole member and lobbyist.

6.      Steven L. Paine is and was at all relevant times the state superintendent of schools. Paine is sued in his individual capacity for all claims for relief, except for the request for prospective injunctive relief, in which case he is sued in his official capacity.

7.      Jan Barth is and was at all relevant times an assistant superintendent in the West Virginia Department of Education. Barth is sued in her individual capacity for all claims for relief, except for the request for prospective injunctive relief, in which case she is sued in her official capacity.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendants are residents of the State of West Virginia and reside in this District. A substantial part of the events or omissions giving rise to the claims in this action occurred in this District.

## FACTS

10.     At all relevant times, Webb was a registered lobbyist in West Virginia and conducted government affairs advocacy on behalf of his client, ACT, Inc. ("ACT") through Capitol Advocates, LLC.

11.     The ACT test is a college entrance exam usually taken by high school students in West Virginia.

12.     The ACT test is the most popular college entrance exam among West Virginia students.

13.     On February 8, 2017, the Governor received a standing ovation during the State of the State address after declaring, "I am going to propose we throw Smarter Balance in the trash can and we go to ACT testing."

14.     The SAT is a different college entrance exam that is administered by an entity known as the College Board. Far fewer West Virginia students take the SAT test than the ACT.

15.     The ACT and SAT are similar education assessment products.

16.     Another product of ACT, called "ACT Aspire," is an assessment that would be contracted by the Department to be given to students in grades three through eight that aligns with the ACT test.

17.     In January 2017, the West Virginia Board of Education ("WVBOE") was reshuffled. Governor Justice appointed three new members to the WVBOE.

18.     On February 16, 2017, at the WVBOE's monthly meeting, newly appointed WVBOE member Chuck Hatfield made a motion to adopt the ACT as the state's test. The West Virginia Department of Education (the "Department") said that the WVBOE could not do that, and that the WVBOE should instead wait and see what action was taken by the Legislature in its then-ongoing legislative session.

19.     Later that month, House Bill 2711 was introduced in the House of Delegates. The Department helped draft the language in H.B. 2711 as introduced. On March 23, 2017, the House Education Committee changed the language related to the statewide assessment that would now require the WVBOE to adopt a standard, curriculum-based achievement college entrance exam for grade eleven that must include separate tests in English, reading, writing, mathematics, and science.

20.     The ACT test readily satisfies these objective requirements.

21.     The House Education Committee's amended assessment language reflected the well-known desire of the Governor, then Legislature, and various educational groups that the State should use the ACT test as the statewide assessment.

22.     On March 23, 2017, Paine was appointed as the State Superintendent of Schools by the WVBOE.

23.     Additionally, earlier in the legislative session, officials at the Department had asked Webb to advocate for a change to the data privacy laws related to EOS, or educational opportunity service. EOS simply allows students who take the ACT test to check a box if they would like to have their scores shared with colleges or universities, scholarships, and the military. The Department explained to Webb that the change to the law was needed if the Department were to choose the ACT test as the statewide assessment.

24.     Although Webb did not want to lobby for a bill changing data privacy law, the Department had a conference call with ACT officials telling them that a bill making such changes was necessary. As a result, Webb ultimately agreed to advocate for the change. The vehicle for this change was S.B. 656, which was introduced and passed by the Legislature with overwhelming support, passing the Senate on a 34-0 vote and the House on a 91-7 vote.

25.     Webb was then shocked to learn that Paine, as the new superintendent, was trying to get the bill vetoed by the Governor. After all, it was the Department that wanted the bill in the first place.

26.     The Governor's office then asked Webb for his views on the bill, and Webb continued to advocate for its enactment because he had been told by the Department that ACT had to have this language changed if ACT wanted to offer EOS in West Virginia.

27.     In April 2017, when Paine learned that Webb was advocating for the Governor to sign S.B. 656—contrary to Paine's wishes—Paine called a national lobbyist for ACT ("National Lobbyist") whom Paine knew personally prior to becoming superintendent. Paine understood that the National Lobbyist would relay his comments to ACT.

28.     Paine told the National Lobbyist that if ACT wanted anything in West Virginia, ACT better "get a handle on Jason Webb" because ACT and Webb were being "too heavy handed."

29.     Paine also made clear to the National Lobbyist that ACT needed to do what Paine said, and implied that otherwise there would be consequences to ACT in West Virginia. Although Paine did not identify the specific consequences, the clear implication was that Paine would use his position, influence, and authority to shut ACT out of remunerative statewide assessment contracts if they did not stop Webb's public advocacy or public expressions that had upset Paine.

30.     Paine told the National Lobbyist that instead of enacting S.B. 656, Paine and ACT could "work out" any issues through WVBOE policy or within the terms of any contract obtained by ACT to provide testing products.

31.     This explanation by Paine runs completely counter to what two attorneys from the Department told Webb and several ACT officials during a conference call during the legislative session.

32.     Paine's stated reason for desiring to have S.B. 656 vetoed by the Governor was that he did not want to reopen the debate over "Common Core."

33.     Paine's stated reason was a mere pretext, indicating Paine's desire to conceal his ulterior motives. S.B. 656 had passed both the House and Senate overwhelmingly. Thus, there was nothing to "debate." Moreover, it was nonsensical for the superintendent, Paine, to try to kill a bill that his Department had said was necessary.

34.     Paine wanted to kill the bill because the bill, if enacted, would have helped ACT in West Virginia.

35.     After Paine's call to the National Lobbyist, the National Lobbyist called Webb and told him what Paine had said.

36.     Following the discussion, the National Lobbyist and Webb concluded that the best course would be to try to get along with Paine since he was the state superintendent, particularly since they knew Paine gets upset easily.

37.     Webb cautioned the National Lobbyist, however, that ACT should expect this kind of behavior from Paine in the future.

38.     As a result, Webb called the Governor's office and told them that it was ok to veto S.B. 656.

39.     The Governor vetoed S.B. 656.

40.     This was the first time Webb was made aware that Paine contacted high ranking ACT, Inc. officials or representatives to threaten them and Webb's client-relationship with ACT as a result of Webb's public advocacy and public expression.

41.     On March 28, 2017, the House passed H.B. 2711, which contained the House Education Committee's amended language calling for the types of annual assessments that ACT offers.

42.     On March 30, Paine demanded a meeting with the CEO of ACT, Inc., but settled for a meeting with a senior vice president of ACT. Paine wanted to meet with all the testing companies to let them know that the Department was going to release a Request for Proposal ("RFP") for those companies to submit bids to provide the new assessments in West Virginia.

43.     On April 4, H.B. 2711 was placed on the agenda of the Senate Education Committee and committee counsel explained the bill to the Committee.

44.     On April 5, officials from the Department met with Senator Mann, then-chairman of the Senate Education Committee, and told him that they wanted to change some parts of the bill.

45.     Chairman Mann asked if the changes that the Department was requesting would have an adverse effect on ACT's chances of being chosen as the statewide assessment. The Department assured Chairman Mann that it would have no effect on them being chosen.

46.     Chairman Mann then agreed to make the changes and submitted them as a committee amendment to be included at the next meeting of the committee.

47.     The Department's changes to the bill, including by removing the five subject matter components of the assessment contained in the House version, would effectively have allowed the Department to more easily select the SAT as the statewide assessment—and not the

ACT—since the changes allowed the Department alone, under Paine's helm, to set their own parameters for the assessment and place the decision solely in their hands.

48.     On April 6, Webb learned of the committee amendment and immediately confronted several officials in the Governor's office. Webb warned them that what the Department was doing to the bill demonstrated that the Department was intent on choosing the SAT despite the Governor, the Legislature, and most educational groups' preference, and the popularity of the ACT in West Virginia.

49.     That same day, H.B. 2711 was changed by the Committee at the request of the Department. Paine testified in front of the Committee about Common Core and other aspects of the bill and said that the Department now supported the Senate committee amendment to the bill.

50.     On March 30, Paine reached out to the National Lobbyist and demanded a meeting as soon as possible with the CEO of ACT, Inc. Instead, a senior vice president of ACT was sent to meet with Paine.

51.     On April 7, Chuck Hatfield resigned from the WVBOE.

52.     On April 10, a senior vice president of ACT met with Paine.

53.     H.B. 2711 was signed by the Governor on April 26.

54.     On May 12, the Department released its RFP for statewide assessments and a blackout period was put in place, prohibiting anyone from discussing the contract other than the formal presentations which are part of the RFP.

55.     On June 5, ACT submitted its response to the RFP as to the grades 3 through 8 test with their ACT Aspire, and on June 19, ACT submitted its response as to the 11th grade test with their ACT test.

56.     SAT also submitted a response to the RFP.

57.     Only ACT and SAT submitted responses to the RFP.

58.     On June 20, during the blackout period of the RFP process, Paine informed Webb in front of an unrelated client of Webb's that "you all"—meaning ACT—"may win the [RFP] for the 11th grade test, but we"—meaning the Department of Education—"are not going to use that three through-eight test. That Aspire or whatever you call it. It's junk," and then walked away.

59.     Paine's comments to Webb during the pendency of the RFP were highly inappropriate and in contravention of the blackout period set forth in the RFP.

60.     Webb then informed the Senior Director of U.S. Government Relations at ACT, Inc. (the "Senior Director"), of Paine's comments.

61.     On July 20, despite what Paine already revealed to Webb, ACT Aspire's team followed procedure and made its formal presentation to the Department as part of the RFP process.

62.     On July 27, the Department informed all vendors that the RFP was cancelled, stating that neither the ACT nor the SAT submission met the minimum criteria. In particular, neither submission scored 50 or above under the scoring system to qualify for further consideration. The scoring system allowed points to be awarded from 0-70. A score below 50 was automatically disqualified.

63.     Sometime after the first RFP was cancelled but before it was reissued shortly thereafter, Paine personally called both companies to give them feedback on their submissions.

64.     Paine later testified to the Senate Education Committee and admitted that he also called the National Lobbyist (for ACT), because, as Paine testified, "I've worked with him before in a previous life" and told him that "you guys [ACT] need to pay attention, close attention, to this RFP because [ACT] is challenged."

65.     Paine knew the National Lobbyist from their past work together at the Council of Chief State School Officers, commonly called "CCSSO."

66.     The RFP was reissued in early August 2017. By the second week of September, SAT was selected as the winner for the statewide assessment for grades three through eight.

67.     SAT was awarded 51 or 52 points, according to Paine during testimony at a Senate Education Committee hearing.

68.     ACT was awarded only 23 points. After lodging a formal protest, the Department rescored ACT by "finding" 26 new points. However, 49 was the highest number that a submission could receive and yet be disqualified outright. Thus, ACT's submission did not proceed to the next stage of competitive bidding under the RFP. As a result, SAT was awarded the statewide assessment contract.

69.     In light of Paine's past comments about ACT and Paine's flagrant breach of the blackout period, the actual scoring and rescoring by the Department of ACT's submission was highly suspicious.

70.     Webb believed then and believes now that the Department's scoring was prejudiced against ACT based on the circumstantial evidence.

71.     In September through December 2017, Webb continued to educate members of the Legislature about the ACT test and ACT Aspire and why these products were preferable to the College Board's products, including the SAT.

72.     On September 18, 2017, Paine, with Department attorney Sarah Stewart in the background, called Webb to ask Webb why he was upset with Paine and the Department about the RFP process, as Paine had heard.

73.     Paine told Webb that the Department followed the law. Webb responded by noting that it was Paine and the Department who had themselves engineered the changes to the assessment selection law (H.B. 2711) while it was in the Senate Education Committee. Paine denied that, saying that all that pre-dated him because he had not been hired as superintendent yet. That was untrue, since Paine had testified in the Senate Education Committee on the amendment to the bill and, with it, told the Committee that he and the Department could support the bill.

74.     After Webb corrected Paine, Paine changed his story and said that the Senate Education Committee amendment was done at a request of a Democratic senator so that the bill would no longer "name ACT."

75.     Webb accurately responded that the bill had never "named" ACT.

76.     The call was then dropped. Webb attempted to call him back, but Paine texted Webb saying that he could not take the call due to a meeting.

77.     Webb and Paine never had another conversation about the topic.

78.     Sometime later in the fall of 2017, Paine contacted the National Lobbyist (of ACT) to once again tell him that ACT should tell Webb to stop criticizing how Paine and the Department conducted the RFP process or they would never do business in the State again.

79.     Webb had publicly expressed his view that the RFP process did not seem fair due to the suspicious scoring that had occurred in both the first score of the reissued RFP and the subsequent score produced under the formal protest.

80.     On January 28, 2018, Paine contacted the Senior Vice President for State and Local Programs at ACT (the "Senior VP for Programs"). Paine told the Senior VP for Programs

that Webb's public criticism of Paine and his Department related to the RFP process was "getting under his skin" and that ACT needed to "handle it or else."

81.     On February 9, 2018, Paine again called the Senior VP for Programs, this time with a fairly urgent tone, likely due to legislators (then in session), led by Chairman Mann, wanting to run a bill to give counties the option to choose either the ACT or SAT standardized testing products.

82.     Paine then met with Chairman Mann and Senator Rucker and told them there is no need for this legislation. Department attorney Sarah Stewart was in this meeting. Paine said the Department can and will do this themselves and to please not pass this bill.

83.     As a result of Paine's promise, Chairman Mann pulled the bill and the Department drafted a statement for Mann to read on the floor of the Senate the next day, which he did. The statement declared that, based on Paine's statement and promise, "Starting next year, the assessment test will be county choice between ACT or SAT."

84.     As it turned out, Paine's statement was false, and the Department has not done what it promised to Senator Mann and Senator Rucker.

85.     In mid-to-late December 2018, Paine and Barth called the Senior VP for Programs at ACT and told him to prevent Webb from posting about certain topics on Twitter, implying negative consequences to ACT if ACT did not do so.

86.     Prior to the call, Webb had authored and publicly posted on Twitter criticizing the SAT as a Common Core test.

87.     The Senior VP for Programs told the Senior Director, both of ACT, about the menacing call from Paine.

88.     The Senior Director then texted Webb to relay to him what Paine had said. The Senior Director wrote to Webb that Paine and Barth "are monitoring your tweets."

89.     In response to this, Webb told the Senior Director that he would "tone down" his tweets.

90.     As a result of Paine and Barth's threatening call, Webb deleted one of his tweets that had included criticism of the Department by name.

91.     Neither the Senior Director nor anyone else at ACT asked Webb to delete his Tweets or stop or limit his tweeting about education policy issues.

92.     On February 6, 2019, Paine and Barth again called the Senior VP for Programs objecting to other recent posts by Webb on Twitter. Paine and Barth told the Senior VP for Programs that ACT needed to get rid of Webb—i.e., fire him—or else ACT would never do any business in West Virginia again.

93.     Prior to the call, Webb had authored and publicly posted several times on Twitter about education policy issues that apparently upset Paine and Barth.

94.     Told about this additional call, the Senior Director texted Webb on February 6 about the call, asking Webb, "Are you DOE [the Department] bashing again?"

95.     As before, neither the Senior Director nor anyone else at ACT asked Webb to delete his Tweets or stop or limit tweeting about education issues.

96.     However, as a result of hearing that Paine had again threatened his client over his tweets about education issues, Webb deleted certain tweets of his that expressed commentary on education policy issues. These tweets had also apparently upset Paine and Barth.

97.     On February 28, 2019, Paine again called the Senior VP of Programs about his displeasure with Webb.

98.     On March 4, Paine called the Senior VP of Programs at ACT directly and demanded a phone call *alone* with the CEO of ACT. Paine made clear to the Senior VP of Programs that Paine did not want anyone else in the room with the ACT CEO when the call occurred.

99.     ACT agreed to those conditions and Paine spoke with the CEO by phone on March 5, 2019. During the call, Paine told the CEO that Webb had a "bad reputation" and that ACT needed to "get rid of him" or the Department would disqualify ACT from participating in future bids due to ACT having an "unscrupulous" person associated with their company.

100.    The CEO responded to Paine that if Webb had done something wrong, then Paine should file a complaint with the West Virginia Ethics Commission. Paine told the CEO that if ACT still had Webb under contract as their lobbyist when the statewide assessment came up again (for a new RFP process), then ACT would be disqualified as a result.

101.    On March 5, 2019, Paine contacted the National Lobbyist (of ACT) seeking to compromise on the language in S.B. 624. The bill would thus allow counties the ability to offer the ACT test as provided for under federal law.

102.    On March 9, Paine walked up to Webb outside the Senate chamber and asked if Webb would agree to meet with him to "mend the fences,"—even though only four days before Paine had called the CEO of ACT to threaten them and Webb's position due to Webb's advocacy and publicly expressed education policy views.

103.    Based on Paine's history, Paine's entreaty to Webb was clearly insincere and reflected only his selfish attempt to avoid negative consequences to his abuses of power.

104.    During this same conversation, Webb asked Paine if he approved of the current language of S.B. 624, which by then included the compromise language that Paine previously

14

sought. Paine indicated he did, and that Department attorney Sarah Stewart had worked out language with Senator Rucker, the chair of the Senate Education Committee.

105.    Paine's statements were once again false. In fact, Paine later asked the Governor's office to veto the bill, which the Governor did.

**COUNT I**

**VIOLATION OF THE FIRST AMENDMENT (42 U.S.C. § 1983) - RETALIATION**

106.    Webb repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

107.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . . ." U.S. Const. amend. I.

108.    "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000); *see ACLU v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation . . . is . . . actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights.")

109.    Title 28 U.S.C. § 1983 provides a federal cause of action for the deprivation of a constitutional right by state officials.

110.    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, . . . subjects, or causes to be subjected, any [person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . ." 28 U.S.C. § 1983.

111.    A plaintiff must establish three elements to prove a First Amendment Section 1983 retaliation claim. First, the plaintiff must demonstrate that his or her speech was protected. Second, the plaintiff must demonstrate that the defendant's retaliatory action adversely affected

15

the plaintiff's constitutionally protected speech. A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Third and finally, the plaintiff must demonstrate that a causal relationship exists between his or her speech and the defendant's retaliatory action. *See Suarez*, 202 F.3d at 685-86.

112.    Webb's speech was protected. As a private citizen, Webb had a First Amendment right to publicly express his views on political issues in West Virginia, including his opposition to certain education policy and education related vendors favored by Paine and Barth.

113.    Paine and Barth have continuously retaliated against Webb for exercising his First Amendment right to free speech by threatening Webb's client ACT with blackballing and closer governmental scrutiny of ACT bids for public contracts if ACT did not shut Webb up or fire him, in response to Webb's participation in the public debate over education issues and vendors at the forefront of education policy debate in West Virginia.

114.    Paine and Barth have used their leverage of potential future punishment against ACT based on their position and authority to try to prevent Webb from exercising his First Amendment rights.

115.    Paine and Barth's ongoing retaliatory actions have adversely affected Webb's constitutionally protected speech because Paine and Barth's threats would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

116.    As a direct and proximate result of Paine and Barth's repeated and continuous threats, Webb has been damaged by deprivation of his First Amendment rights to freedom of speech.

117. As a result of Paine and Barth's repeated, continuous, and ongoing unconstitutional conduct, Webb has been damaged by deprivation of his rights to freedom of speech under the First Amendment, and suffered harm to his reputation, his business relationship with ACT, emotional distress, anguish, embarrassment, and humiliation.

118. Webb is also entitled to reasonable attorney's fees and costs. *See* 42 U.S.C. § 1988.

119. Paine and Barth are plainly not entitled to qualified immunity in this case. *First*, Paine and Barth's conduct violated Webb's First Amendment rights, as explained above. *Second*, it is "well established" in the Fourth Circuit "that a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right." *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001). And "[i]n the specific context at issue here, it is clearly established that the First Amendment prohibits an officer from retaliating against an individual for speaking critically of the government." *Blankenship v. Manchin*, 471 F.3d 523, 533 (4th Cir. 2006).

## COUNT II

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

120. Webb repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

121. Under West Virginia law, a claim for tortious interference exists where the plaintiff can demonstrate "(1) [the] existence of a contractual or business relationship or expectancy; (2) an intentional act of improper interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages. *Hatfield v. Health Management Associates of West Virginia*, 223 W.Va. 259, 672 S.E. 395, 403 (2008);

*Torbett v. Wheeling Savings & Trust Co.*, 173 W.Va. 210, 314 S.E. 166 (1983)." *Smith v. Teach*, No. 3:07-CV-49, 2009 WL 2378670, at *2 (N.D. W. Va. July 28, 2009).

122.   "One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him." *Restatement (Second) of Torts* § 766A (1979); *see, e.g.*, *Smith v. Teach*, No. 3:07-CV-49, 2009 WL 2378670, at *2 (N.D. W. Va. July 28, 2009) (applying WV law; relying on Section § 766A of the Restatement in denying summary judgment); *Torbett*, 314 S.E.2d at 171-72 ("rel[ying] upon the Restatement for guidance").

123.   "If the plaintiff's performance has intentionally been made more burdensome or more expensive by the actor, the cost that he incurs in order to obtain the performance by the third party has increased, and the net benefit from the third person's performance has been correspondingly diminished. This Section [of the Restatement] covers that loss, too." *Restatement (Second) of Torts* § 766A cmt. (1979).

124.   "One who is liable to another for interference with a contract . . . is liable for damages for (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." *Restatement (Second) of Torts* § 774A (1979).

125.   "Recovery for emotional distress is allowable if it was reasonably to be expected to result from the interference. The same is true of actual harm to reputation." *Restatement (Second) of Torts* § 774A cmt.

126.     The Supreme Court of Appeals of West Virginia has relied upon Section 774A of

the Restatement. *See, e.g.*, *Bd. of Educ. of McDowell Cty. v. Zando, Martin & Milstead, Inc.*, 390

S.E.2d 796, 808 (W. Va. 1990).

127.     At all relevant times, Webb has had a contractual or business relationship and

expectancy with ACT.

128.     Paine and Barth intentionally, improperly, and tortiously interfered with Webb's

business relationship and expectancy with ACT by repeatedly contacting and threatening ACT

with adverse public action if ACT did not limit Webb's ability to lobby for his client or fire him.

129.     Paine and Barth's unlawful interference caused damage to Webb for harm to

business reputation, emotional distress, anguish, embarrassment, and humiliation.

## COUNT III

## CIVIL CONSPIRACY

130.     West Virginia law "recognize[s]" civil conspiracy "as a separate claim." *Jane*

*Doe-1 v. Corp. of President of The Church of Jesus Christ of Latter-day Saints*, 443, 801 S.E.2d

443, 458 (W. Va. 2017).

131.     "'A civil conspiracy is a combination of two or more persons by concerted action

to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by

unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts

done by the defendants to the injury of the plaintiff.' Syl. Pt. 8, *Dunn v. Rockwell*, 225 W.Va. 43,

689 S.E.2d 255 (2009)." Syl. Pt. 3, *Corp. of President of The Church of Jesus Christ of Latter-*

*day Saints*, 801 S.E.2d 443.

132.     "'A civil conspiracy is ... a legal doctrine under which liability for a tort may be

imposed on people who did not actually commit a tort themselves but who shared a common

plan for its commission with the actual perpetrator(s).' Syl. Pt. 9, in part, *Dunn v. Rockwell*, 225

W.Va. 43, 689 S.E.2d 255 (2009)." Syl. Pt. 4, *Corp. of President of The Church of Jesus Christ of Latter-day Saints*, 801 S.E.2d 443.

133.    Paine and Barth unlawfully conspired to harm Webb.

134.    Paine, together with Barth's counsel and support, repeatedly retaliated against Webb for exercising his First Amendment rights.

135.    Paine, together with Barth's counsel and support, repeatedly interfered with Webb's business relationship with ACT.

136.    As a result of Paine and Barth's unlawful conspiracy, Webb suffered damages for deprivation of his First Amendment right to free speech, harm to his business relationship with ACT, business reputation, emotional distress, anguish, embarrassment, and humiliation.

\*\*\*

**WHEREFORE**, Webb respectfully requests the following relief:

1. Trial by jury;

2. Judgment against the defendants in their individual capacities for compensatory and consequential damages in an amount to be determined at trial, plus court costs and expenses;

3. Attorney's fees and costs under 28 U.S.C. § 1988;

4. Pre-judgment and post-judgment interest at the maximum allowable rates at law;

5. Declaratory and injunctive relief against the Defendants in their official capacities as to Count I;

6. Punitive damages against the Defendants in their individual capacities; and

7. Any other relief to which Webb may seek or be entitled to under law or equity.

Dated: June 12, 2019                         **JASON WEBB**,

                                             **By Counsel**.


                                             /s/ J. Zak Ritchie
                                             J. Zak Ritchie (WVSB #11705)
                                             Michael B. Hissam (WVSB #11526)
                                             HISSAM FORMAN DONOVAN RITCHIE PLLC
                                             P.O. Box 3983
                                             Charleston, WV 25339
                                             681-265-3802 *office*
                                             304-982-8056 *fax*
                                             zritchie@hfdrlaw.com
                                             mhissam@hfdrlaw.com