**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**JASON WEBB,**

    **Plaintiff,**           **Civ. Action No. 2:19-CV-447**
                     **(Hon. John T. Copenhaver)**

**v.**

**STEVEN L. PAINE, State Superintendent of Schools,
in his individual capacity and official capacity; and
JAN BARTH, Assistant State Superintendent of Schools,
in her individual capacity and official capacity,**

    **Defendants.**

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF JASON WEBB'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

---

J. Zak Ritchie (WVSB #11705)
Michael B. Hissam (WVSB #11526)
Andrew C. Robey (WVSB #12806)
Hissam Forman Donovan Ritchie PLLC
P.O. Box 3983
Charleston, WV 25339
(681) 265-3802 *office*
(304) 982-8056 *fax*

*Counsel for Plaintiff Jason Webb*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    I.    The standardized testing company ACT, Inc. hires Jason Webb
        to advocate for its interests in West Virginia. ................................................ 2

    II.   Steve Paine and Jan Barth mount a pressure campaign against
        Jason Webb. ....................................................................................................... 3

    III.  Paine threatens the CEO of ACT, Inc. over Jason Webb. ................................ 8

    IV.  The end of Webb's business relationship with ACT. ..................................... 11

ARGUMENT ........................................................................................................................ 12

    I.    Paine and Barth are liable under Count I for First Amendment
        retaliation. ........................................................................................................ 12

    II.   Paine and Barth are liable under Count II for tortious
        interference. ..................................................................................................... 16

    III.  Paine and Barth are liable under Count III for civil conspiracy. ................... 19

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Wicomico County, Md.*, 999 F.2d 780 (4th Cir. 1993)...................................................... 12

*Blankenship v. Manchin*, 471 F.3d 523 (4th Cir. 2006)...................................................... 12, 15, 16

*Bright v. QSP, Inc.*, 20 F.3d 1300 (4th Cir. 1994) ...................................................... 14

*Brinkman v. Budish*, 692 F. Supp. 2d 855 (S.D. Ohio 2010)...................................................... 13

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005).......... 12

*Jane Doe-1 v. Corp. of President of The Church of Jesus Christ of Latter-day Saints*, 801 S.E.2d
   443 (W. Va. 2017)...................................................... 19

*N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008)...................................................... 13

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)...................................................... 13

*Smith v. Teach*, No. 07-49, 2009 WL 2378670 (N.D. W. Va. July 28, 2009) ...................... 16, 18

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676 (4th Cir. 2000) .............................................. 12, 13

*Torbett v. Wheeling Dollar Sav. & Tr. Co.*, 314 S.E.2d 166 (W. Va. 1983) ......................... 17, 18

*Wilspec Techs., Inc. v. DunAn Holding Grp., Co.*, 204 P.3d 69 (Okla. 2009) .......................... 18

**Statutes**

28 U.S.C. § 1983...................................................... 12

**Rules**

Fed. R. Civ. P. 56(a). ...................................................... 13, 16, 19

**Constitutions**

U.S. Const. amend. I ...................................................... 12

**Treatises**

*Restatement (Second) of Torts* § 766A (1979)...........................................................................18

*Restatement (Second) of Torts* § 774A (1979)...........................................................................19

## INTRODUCTION

This case is straightforward. Mr. Webb advocated as a registered lobbyist on behalf of his education industry client and national testing company ACT, Inc. At the same time, Mr. Webb publicly expressed his individual views concerning education policy on social media. This upset then-superintendent Steve Paine and assistant superintendent Jan Barth, who disagreed with Webb. Hoping to quash his criticism and advocacy, Defendants retaliated against Mr. Webb by directly interfering with—and eventually destroying—his business relationship with ACT.

Now that discovery is complete, the overwhelming evidence—much of which cannot be genuinely disputed—proves the sorry truth of Defendants' campaign against Mr. Webb. But this Court need not take Mr. Webb's word for it. Paine and Barth's own words demonstrate their violation of Mr. Webb's First Amendment rights and tortious interference with Webb's business relationship with ACT, Inc.

Critical and undisputed evidence includes:

- Testimony from Barth that Paine "wasn't happy" about some of Webb's tweets because they were "not supportive of the Department of Education," and that Paine "wanted to do something about it";[1]

- Admissions in Defendants' Answers that they called a senior vice president of ACT several times to "object" to Webb's "lobbying" and "activities on Twitter";[2]

- Text messages from Paine to ACT representatives disparaging Webb's integrity and saying, "[w]e have also compiled tweets and social media posts where Webb has sought to discredit the WVDE . . . [and] also criticizes strongly the Common Core,"[3] for which Paine had long advocated;[4]

- Text messages from Paine to ACT representatives criticizing them for failing "to hold Webb in check," despite being "asked" by Paine to do so "on at least two occasions";[5]

- Emails from Barth to ACT, Inc.'s competitor, College Board, urging them to hire a lobbyist in West Virginia to "neutralize Webb and effectively dispatch him to the curb!

---

[1] Ex. 1 (Barth dep. 142:15—143:7).
[2] ECF 6 ¶¶ 85, 92; ECF 7 ¶¶ 85, 92.
[3] Ex. 3 (Paine dep. ex. 11 (Webb_000695)); Ex. 4 (Paine dep. 154:20-160:9).
[4] Ex. 4 (Paine dep. 80:11-13).
[5] Ex. 3 (Paine dep. ex. 11 (Webb_000693)).

Again. The sooner the better!!!";[6] Stating that bringing on a lobbyist "to combat Webb" would "make all of our lives easier, . . . [e]specially Dr. Paine's";[7]

- Text messages from Paine to ACT representatives, criticizing ACT for "taking Webb's word over mine. *Let alone I am the customer*," and further posturing himself to ACT as a "constitutional officer;"[8]

- An internal email sent by *the CEO* of ACT that memorialized a call from Paine during which Paine criticized Webb as having a "bad reputation" and "indicated that the issue with Webb could have implications" for ACT's "business" with WVDE "in the future"—statements the CEO believed "was sort of a threat" and an "illegal practice;"[9]

- After ACT terminated Webb's contract following Paine and Barth's pressure campaign against him, Paine texted a senior vice president of ACT for confirmation of that fact and then said, "Ok thanks. *Appreciate the support*."[10]

The well-documented misconduct of Paine and Barth—illustrated by their own words—satisfies the liability elements of Mr. Webb's claims. Accordingly, summary judgment for Plaintiff on liability is proper, leaving for a jury to decide compensatory and punitive damages.

## BACKGROUND

### I.   The standardized testing company ACT, Inc. hires Jason Webb to advocate for its interests in West Virginia.

Jason Webb is a private citizen. Among other things, he works as a registered lobbyist. Webb conducts his lobbying and consulting business activities through a limited liability company, Capitol Advocates, LLC, of which Webb is the sole member and manager.[11] He entered into a consulting agreement with ACT, Inc., to provide it lobbying services in West Virginia as an independent contractor effective January 2016.[12] The contract term was repeatedly extended by ACT—without fail—until ultimately terminated in July 2019, after the actions subject to this lawsuit took place.[13]

---

[6] Ex. 2 (Barth dep. ex. 18).
[7] Ex. 2 (Barth dep. ex. 18); Ex. 1 (Barth dep. 115—119).
[8] Ex. 3 (Paine dep. ex. 11 (Webb_000694-95)) (emphasis added).
[9] Ex. 6 (ACT dep. ex. 29); Ex. 7 (ACT dep. 167—168).
[10] Ex. 3 (Paine dep. ex. 11 (Webb_000697)) (emphasis added).
[11] Ex. 8 (Webb dep. 197).
[12] Ex. 8 (Webb dep. 18:7-9; 23:16-17; 197:21-24; 198:1-4).
[13] Ex. 8 (Webb dep. 209:5—214:4).

2

## II. Steve Paine and Jan Barth mount a pressure campaign against Jason Webb.

2017 Legislative Session. Steve Paine returned as Superintendent of Schools beginning in late March 2017, which was near the end of the legislative session that had convened in January.[14] Before Paine arrived, West Virginia Department of Education ("WVDE") officials told ACT and Webb that if ACT was to be selected as the vendor to provide the statewide assessment for 11th grade students, State Code would have be changed to allow ACT to continue to offer Education Opportunity Service ("EOS") under a state contract. Webb asked WVDE if they could correct the situation through contract or policy. WVDE said no, assuring him that Code had to be changed to permit ACT to continue offering EOS.[15] After WVDE told ACT the same thing, ACT requested that Webb advocate for Senate Bill 656, which ultimately passed the State Senate unanimously and the House of Delegates overwhelmingly.[16]

Then, Paine was appointed Superintendent. Within days, Paine changed the WVDE's position and advised the Governor *to veto it*.[17] This came at the same time Webb learned that ACT's primary competitor, the College Board, had expressed its opposition to the bill.[18] Paine found out that Webb was advocating on behalf of ACT for it to be signed.[19] So Paine called a national consultant for ACT, Scott Frein, to express frustration with Webb's lobbying, telling Frein that ACT "better get a handle" on Webb, or that "ACT will never get anything in West Virginia."[20] As a result of the pressure and opposition from Paine expressed directly to ACT

---

[14] Ex. 4 (Paine dep. 18:7-14).
[15] Ex. 8 (Webb dep. 89:10—92:23).
[16] Ex. 8 (Webb dep. 92:16-19).
[17] Ex. 4 (Paine dep. 34:21—35:4; 29:5-16); *see also* Ex. 8 (Webb dep. 95-96); Ex. 1 (Barth dep. 89:11-16) (testifying that Paine was responsible for deciding WVDE's position on bills).
[18] Ex. 8 (Webb dep. 97: 20—98:2; 103:15-20).
[19] Ex. 4 (Paine dep. 30:21-24).
[20] Ex. 8 (Webb dep. 99:5-20).

3

representatives, which was conveyed to Webb, ACT decided to let Joey Garcia with the Governor's office know, through Webb, that the bill could be vetoed. It was.[21]

The major education bill that session, House Bill 2711, was also a flashpoint. Among other things, the bill contained requirements for the type of assessment the WVDE would contract for to give to all 11th grade students. The House amended the bill's language to require WVDE to select an 11th grade exam that looked very much like what the ACT offered—its eponymous "ACT test"—which was the most popular college entrance test among West Virginia families and members of the House.[22] The amended House bill would have required WVDE to adopt an exam for 11th grade students that included five separate compontent tests: English, reading, writing, math, and science. The ACT test would have readily met those requirements.[23]

But once H.B. 2711 went to the Senate, WVDE officials, led by Paine, persuaded the newly elected and appointed Senate Education Committee Chair, Senator Kenny Mann, to reverse the House's assessment changes that favored ACT. Even though Senator Mann favored the ACT test, WVDE officials assured him that reversing the House's changes would not adversely affect ACT's chances of being selected.[24] (That turned out to be false.) The bill was signed into law *without* the pro-ACT House language.

The WVDE's Requests for Proposal ("RFP"). Following the enactment of H.B. 2711, the WVDE conducted a public bidding process starting to select two statewide assessments: one for grades 3-8 and another for grade 11. ACT submitted a bid for the 3-8th grade test—a product known as "ACT Aspire"—and a bid for the 11th grade test using the "ACT test."[25] The College

---

21 Ex. 8 (Webb dep. 105:8—106:2).
22 Ex. 10 (Rhudy dep. 56:2-15); Ex. 8 (Webb dep. 24:11—25:11, 26:20—28:2).
23 Ex. 8 (Webb. dep. 38:03—45:21).
24 Ex. 8 (Webb dep. 71:3-20).
25 Ex. 10 (Rhudy dep. 56:2-15); Ex. 8 (Webb dep. 24:11—25:11, 26:20—28:2).

Board, with its "SAT test," was the only other bidder for the 11th grade test. After the proposal

was let, a "blackout period" was imposed, during which discussion between vendors and the

WVDE about the RFP were prohibited.26 The purpose of the "blackout period," as Paine

testified, was "to preserve the integrity of the process."27 But Paine himself violated it.

On the evening of June 20, Mr. Webb was at the Stonewall Jackson Resort sitting and

talking with a representative of another national client of his.28 (The West Virginia Association

of School Administrations was occuring at the resort.) Then Paine walked in with some others.

Seeing Webb, Paine broke away from his group and approached him. Webb and his client stood

up to greet him politely. But Paine looks only at Webb, and tells him: "[W]e"—the WVDE—

"are not going to use that – that 3-8 [test], that Aspire. That's junk."29 Shocked, Webb was at a

loss for words. He attempted to introduce his client, but Paine just walked away. Although he did

not admit the encounter, Paine *refused to deny* that it had happened as Webb testified.30 This

happened weeks *before* ACT, Inc.'s Aspire team was scheduled to give their presentation to the

WVDE in support of their bid. But the Superintendent had already made up his mind, and he

didn't care that Webb knew it—blackout period or not. Ultimately, as Paine vowed, ACT Aspire

lost the bid for the 3-8 test.31

The results of the RFP for the 11th grade test came back in the late summer of 2017. The

first RFP result was a wash; neither bidder obtained sufficient points to win. Following a rebid,

WVDE awarded the 11th grade test to the College Board's SAT,32 much to the surprise of many

---

26 Ex. 4 (Paine dep. 54:2-24).
27 *Id*.
28 Ex. 8 (Webb dep. 119:7—120:18).
29 Ex. 8 (Webb dep. 120:7-10).
30 Ex. 4 (Paine dep. 56:3—57:9).
31 Ex. 4 (Paine dep. 57:15-21).
32 Ex. 4 (Paine dep. 58:3-6).

in the legisature and state's education community.[33] Upon receiving the scoring information, ACT, Inc. identified significant and unusual discrepancies in the scoring and filed an official protest with WVDE—much of which related to WVDE's disparate treatment of science.[34] WVDE acted as their own review committee. The same people who chose SAT over ACT were asked to review the protest documents—including Paine.[35] WVDE, with internal documents showing concern about their ability to "justify" the science score,[36] nonetheless denied the protest. SAT would be the test for 11th graders.

Mr. Webb's public expressions. Although Mr. Webb was not directly involved in the RFP process for ACT, he was kept aware of what was happening by his client. ACT expressed to Webb that the public bidding process troubled them greatly. Thereafter, and throughout the fall and winter of 2017 and into 2018, Webb continued to publicly express his views, using Twitter, that the RFP process was not conducted fairly, and that WVDE's selection of the SAT was a poor choice because the redesigned SAT was so closely aligned to the Common Core standards. For example, Webb posted to Twitter in September a video clip from the hit comedy "Ghostbusters" as a "parody" of the WVDE's scoring decisions.[37] This upset folks at WVDE, as Webb later learned.[38]

In late 2017, Paine once again contacted Frein, telling him that ACT should do something about Webb criticizing how Paine and the WVDE conducted the RFP, implying that ACT would face difficulty if they wanted to do business with the state in the future—comments that were relayed to Webb. And in January 2018, Paine contacted Scott Montgomery, an ACT senior vice

---

[33] Ex. 8 (Webb dep. 129:6-19).
[34] Ex. 4 (Paine dep. 58:7-9); Ex. 11.
[35] Ex. 4 (Paine dep. 197:14—198:22); Ex. 12 (D_019372).
[36] Id.; Ex. 13 (Rhudy dep. ex. 1 (D_013587)).
[37] Ex. 8 (Webb dep. 140:11—142:15).
[38] Ex. 1 (Barth dep. 141:3—143:7); Ex. 10 (Rhudy dep. 47:15—49:16).

president to complain about Webb's public criticism of the RFP process, telling him that Webb's views and lobbying activity were "getting under [his] skin" and that ACT needed to "handle it or else."39 And in January 2018, Paine is on video testifying in a Senate committee about his department's selection of SAT, saying to Senators: "the reason I'm going through this is that there's a lobbyist over here spreading things to contrary"—referring to Webb.40

Paine called Montgomery again in February 2018 to express concern about a bill that Senator Mann wanted to run to give *counties* the option to choose either the ACT or SAT testing products (the "local option") despite WVDE's selection of the SAT for statewide use. Paine and/or his staff met with Chairman Mann and Senator Rucker and told them that this legislation was unnecessary, because the Department could and would itself give counties the power to choose ACT through existing law in the Spring of 2019. As a result of Paine's promise, Chairman Mann pulled the bill, and the WVDE drafted a statement for him to read from the floor, which he did. The statement said in part, "starting next year, the assessment test will be county choice between ACT and SAT." Once again, Paine's department failed to do what he promised, to the detriment of ACT. This is around the time that Paine recruited Barth to rejoin the WVDE as a special assistant and before moving her into an assistant superintendant position shortly thereafter.41

As it became clear that the WVDE under Paine was intending to delay ACT's ability to be selected as a local option, Webb continued to author social media posts that were critical of the WVDE, the public education system generally, and the WVDE's selected SAT test as an exam based on the Common Core standards. Many of these public expressions drew Paine and

---

39 Ex. 8 (Webb dep. 150:18—151:4).
40 Ex. 8 (Webb dep. 223:17—225:17); Senate Fin. Comm., 3:59:30—4:03:00 (Jan. 18, 2018), available at this link.
41 Ex. 1 (Barth dep. 37:8—42:7).

Barth's attention—in a decidedly negative way. Ultimately, Webb's tweeting drew the attention of at least 10 different WVDE officials.[42] In response, the WVDE, under Paine's direction, and with Barth's direct involvement, "compiled" Mr. Webb's social media posts.[43] Numerous WVDE personnel were enlisted in this effort.[44] The tweet collections, sometimes running numerous pages long, were then sent or communicated *directly* to a variety of ACT representatives.[45] As Paine and Barth admitted, they did not compile tweets from any other lobbyist or private citizen, much less transmit and criticize them to the lobbyist's employer.[46]

At the same time, also throughout 2018 and into early 2019, Paine and Barth worked closely with representatives of ACT's primary competitor in West Virginia, the College Board. Barth provided the College Board with "private" updates on what was happening in the state legislature—which she did not do for ACT.[47] And finally, Paine and Barth urged the College Board to bring on another lobbyist in West Virginia to "neutralize Webb and effectively dispatch him to the curb! Again. The sooner the better!!!" Bringing on a lobbyist "to combat Webb," Barth wrote, would "make all of our lives easier"—"[e]specially Dr. Paine's."[48] After all, as the director of the WVDE assessment office put it, Webb "drives Paine crazy."[49]

## III.    Paine threatens the CEO of ACT, Inc. over Jason Webb.

Paine and Barth's campaign against Mr. Webb reached a climax in March 2019. According to Paine, he heard from the in-house lobbyist and lawyer at WVDE, Sarah Stewart, that a member of the House of Delegates told Stewart that the Delegate had heard that Webb had

---

[42] Ex. 1 (Barth dep. 159:2—160:8).
[43] Ex. 3 (Paine dep. ex. 11 (Webb_000695)); Ex. 14; Ex. 15; Ex. 16; Ex. 17; Ex. 18; Ex. 19; Ex. 20; Ex. 1 (Barth dep. 162:16-24); Ex. 4 (Paine dep. 115:18-19).
[44] Ex. 1 (Barth dep. 142:3—143:7); Ex. 10 (Rhudy dep. 43:19-23, 48-51:2); Ex. 21 (Butcher dep. 28-31; 42:13-43).
[45] Ex. 1 (Barth dep. 160:10-13, 164:4—179:22); Ex. 14; Ex. 15; Ex. 16; Ex. 17; Ex. 18; Ex. 19; Ex. 20.
[46] Ex. 1 (Barth dep. 127:11-18); Ex. 4 (Paine dep. 131:1-4); Ex. 21 (Butcher dep. 42:20-24).
[47] Ex. 1 (Barth dep. 75:12-81:10); Ex. 26 (Barth dep. ex. 13); Ex. 22; Ex. 25.
[48] Ex. 2 (Barth dep. ex. 18); Ex. 1 (Barth dep. 115—119:3)
[49] Ex. 10 (Rhudy dep. 57); Ex. 13 at *2 (Rhudy depo exhibit 1).

"in some way stated or implied" to the Delegate that Paine "was inappropriately receiving a benefit" from the College Board.[50] Mr. Webb, of course, denies it completely, and Defendants have no competent evidence that it ever occured. But in response to hearing this, neither Paine nor anyone on his behalf reached out to the Delegate to confirm or investigate what was supposedly said.[51] Nor did Stewart, who admitted she did not even bother to ask the Delegate any questions about the circumstances of what was supposedly said. Nor did anyone reach out to Webb about it.[52] No investigation, no corroboration, no diligence, no evidence.[53]

Instead, the *only* action that Paine undertook in response to Stewart's relayed rumor was to demand a call with the CEO of ACT, Marten Roorda, *alone*, to denounce Webb, while expressing or implying the need for ACT to take action against him.[54] The call was set.

Not long before his scheduled call with the CEO, Paine sent a slew of text messages to ACT senior vice president Montgomery and ACT consultant Frein, heaping scorn on ACT for not doing enough "to hold Webb in check" and reminding them of Webb's public social media posts critical of the "WVDE" and the "Common Core." He also emphasized Paine's standing "as the customer" and "constitutional officer" when ACT considers whom they should believe—Webb or Paine. Paine confirmed that he authored and sent the string of messages.[55]

Next came Paine's call with CEO Roorda. Although Paine demanded that CEO Roorda be alone on his end, Paine concealed from him that his in-house lawyers, Heather Hutchens and Sarah Stewart, were silently listening in on the call. (Stewart never spoke up; the CEO never knew she was there.) With his campaign against Webb galvanized by an un-investigated, third-

---

[50] Ex. 4 (Paine dep. 109:9-13); Ex. 27, Interrogatory 1 (Paine's Responses to Plaintiff's 2nd Set of Discovery).
[51] Ex. 4 (Paine dep. 154:2-13).
[52] *Id*. (Paine dep. 154:12-13).
[53] Ex. 1 (Barth dep. 154:6-10); Ex. 4 (Paine dep. 110:9-111:7); Ex. 28 (Stewart dep. 53:4—54:20, 86:14—87:7).
[54] Ex. 4 (Paine dep. 127:14—128:3).
[55] Ex. 3 (Paine dep. ex. 11); Ex. 4 (Paine dep. 154:20-167:17).

hand rumor, Paine used the call to tell the CEO that Webb had a "bad reputation"—even though Paine's own top staff would later swear under oath that they either didn't know about Webb's reputation or that he affirmatively did *not* have a bad reputation.[56] CEO Roorda responded that if Paine believed Webb had done something inappropriate, Paine should file a complaint with the West Virginia Ethics Commission. Paine never did. *No one* ever did.[57]

Thereafter, to the CEO's surprise, Paine turned the call over to Hutchens, who explained state "purchasing" rules, suggesting that if ACT continued to retain Webb, WVDE would use purchasing rules to disqualify ACT from future public contracts. The call lasted 15 to 20 minutes. Immediately after the call, the CEO memorialized the call in an internal email to senior vice president Montgomery. ACT, Inc. testifed that it stands by what CEO Roorda wrote.[58]

| From: | Marten Roorda |
|---|---|
| To: | Scott Montgomery |
| Subject: | WV |
| Date: | Tuesday, March 05, 2019 2:02:40 PM |

Scott,

I had a 20 min call with Mr. Paine, and his general counsel was also on the call. Which surprised me, but was OK. After going through some history he came to the issue. He only addressed the role of Jason Webb, who he said has a bad reputation and insulted him for receiving a kickback fee from the CB. I said I heard no complaints about Jason's behavior and from my position was not able to assess the situation. I advised him to file a complaint with the Ethics Board. Mr. Paine said he was still considering what action to take. He also said that WV may be doing business with ACT in the future and indicated that the issue with Webb could have implications. His counsel said that regulations for purchase practicing could effect the way they chose vendors and that Jason Webb's behavior may come close to actual slander. I thought this was a sort of a threat. And I don't like it. I even think such a threat is illegal practice.

Marten

---

[56] Ex. 1 (Barth dep. 153:14-21); Ex. 28 (Stewart dep. 56:12-14); Ex. 29 (Hutchens dep. 45:2-23).
[57] Ex. 1 (Barth dep. 152:7—153:21).
[58] Ex. 7 (ACT dep. 167—168); Ex. 6 (ACT dep. ex. 29).

IV.    **The end of Webb's business relationship with ACT.**

Webb had a final, unsolicited encounter with Paine only a few days after the Roorda call. As the legislative session was nearing its end, Webb was seated alone at a table outside of the Senate Chamber at the West Virginia Capitol.[59] Paine approached Webb, ostensibly in an attempt to "mend fences." But the Rubicon had been crossed. Webb asked Paine if his department was fine with the compromise language in Senate Bill 624, which was then awaiting action by the Governor. Paine told Webb that he was "fine" with it.[60] But in reality, Paine told the Governor's General Counsel that the Governor should veto the bill, which he did.[61] With the loss of the statutory local option under Senate Bill 624 and consistent delays from WVDE to obtain necessary approval under federal law, the headwinds for ACT coming from Paine's WVDE were, by then, too great. By May 2019, ACT effectively pulled the plug on attempting to work with the WVDE to ensure their well-known ACT test could be available for counties as a local option for the 11th grade state assessment.[62]

And so, on June 12, 2019, Webb filed this legal action to hold Paine and Barth accountable for their actions. It advances three claims of relief against each defendant: 1) Section 1983 – First Amendment retaliation; 2) tortious interference with business relationship; and 3) civil conspiracy against the Defendants for working in concert to commit their unlawful acts.[63]

ACT thereafter determined—based on a "confluence of things that were happening that led to multiple considerations about [its] overall engagement in West Virginia,"[64]—to exercise its right to terminate its lobbying contract with Webb. Those considerations included that ACT

---

[59] Ex. 8 (Webb dep.185:22—187:14).
[60] Ex. 8 (Webb dep. 187:8).
[61] Ex. 27 at RFA 8 (Paine's Responses to Plaintiff's 2nd Set of Discovery); Ex. 8 (Webb dep. 187:21—188:20).
[62] Ex. 30.
[63] ECF 1. Consistent with governing law, Webb seeks only prospective relief against each defendant in their official capacities and money damages against each defendant in their individual capacities only. ECF 1, ¶¶ 6-7 & at *20.
[64] Ex. 7 (ACT depo. 60:13-15).

11

was "getting nowhere with [WVDE] with regard to district choice," the "changing" political

"landscape," and the commencing of this action to hold Paine and Barth accountable under law.[65]

Paine wasn't through, however. Upon hearing the news that ACT ended its contract with

Webb, he sent an unsolicited text message to ACT senior vice president Montgomery seeking to

confirm the news. Once confirmed, Paine responded: "Ok thanks. *Appreciate the support.*"[66]

## ARGUMENT

### I.    Paine and Barth are liable under Count I for First Amendment retaliation.

The First Amendment provides that "Congress shall make no law . . . abridging the

freedom of speech. . . ." U.S. Const. amend. I. "The First Amendment right to free speech

includes not only the affirmative right to speak, but also the right to be free from retaliation by a

public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685

(4th Cir. 2000); *see ACLU v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993)

("Retaliation . . . is . . . actionable because retaliatory actions may tend to chill individuals'

exercise of constitutional rights.").

A plaintiff must establish three elements to prove a First Amendment retaliation claim

under 28 U.S.C. § 1983. *Blankenship v. Manchin*, 471 F.3d 523, 528 (4th Cir. 2006). First, the

plaintiff must show that his or her speech was protected. Second, the plaintiff must show that the

defendant's retaliatory action adversely affected the plaintiff's constitutionally protected speech.

A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely

deter a person of ordinary firmness from the exercise of First Amendment rights. *Constantine v.*

*Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Third and finally,

the plaintiff must show that a causal relationship exists between his or her speech and the

---

[65] Ex. 7 (ACT depo. 61:1-9).
[66] Ex. 3 (Paine dep. ex. 11 (Webb_000697)) (emphasis added).

defendant's retaliatory action. *Suarez*, 202 F.3d at 685-86. Ample, undisputed evidence satisfies the liability elements, and Webb is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

*First*, there is no genuine dispute of material fact that Webb's speech was protected. Webb's speech—his public social media posts that drew the wrath of Paine, Barth, and others working for Paine—criticized the WVDE, the public education system generally, the WVDE's selected statewide testing vendor for 11th grade students, and the Common Core education standards (for which Paine had been an ardent supporter). This is classic protected speech. *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 296 (4th Cir. 2008) (free speech is "the essential freedom that defines our ability—both individually and collectively—to speak in unfettered fashion on the most pressing issues of the day, and to express approval or disapproval of the functioning of our representative government"); *accord N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (observing our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). Even Defendants agreed that these issues are matters of public debate and concern.[67]

In addition, there is no dispute that Webb's legitimate lobbying activities about which Paine and Barth complained bitterly to ACT officials were protected by the First Amendment. *Brinkman v. Budish*, 692 F. Supp. 2d 855, 861 (S.D. Ohio 2010) ("Lobbying the government falls within the gambit of protected First Amendment activity.") (citing cases). There is also no dispute that Webb's lobbying activities were entirely legitimate. At no point did Paine, Barth, or anyone under their control file a complaint against Webb with the West Virginia Ethics Commission, the body that regulates registered lobbyists.

---

[67] Ex. 4 (Paine dep. 81:23-82:15); Ex. 1 (Barth dep. 125:2-17).

*Second*, there are ample, undisputed facts showing that Paine and Barth engaged in retaliatory conduct, and that their retaliatory conduct adversely affected Webb's protected speech. Specifically, Paine and Barth responded to Webb's public social media posts by repeatedly and directly contacting ACT officials and representatives to express their frustration and displeasure him, pressuring ACT—expressly and implicitly—to take action against him.

For starters, Paine and Barth admitted in their Answers that they, working together, telephoned a senior vice president of ACT, Inc. at the company's headquarters in Iowa on *at least* two separate occasions to "object" to Webb's "lobbying" and "activities on Twitter."[68] In addition, there is a significant body of evidence that Paine texted and called the same and other ACT officials or representatives on several other occasions to express his dissatisfaction with Webb's speech and lobbying, insinuating that ACT must do something to make Webb stop.[69] Paine confirms his prior requests that ACT "hold Webb in check" by text message in March 2019. Had Paine, Barth, or anyone at WVDE *actually believed* Webb had done something improper, why did they not contact the Ethics Commission instead? The question answers itself.

The undisputed documentary evidence also includes Paine's own text messages, in which he heaped scorn on ACT representatives, including a senior vice president, for failing to "hold Webb in check" as Paine had "asked" them to do so "on at least two occasions." And ACT's steadfast refusal to discipline Webb in any way resulted in Paine ultimately setting up and holding a call with the CEO, during which Paine "threat[ened]" ACT, over their failure to take action against Webb. All told, this evidence shows that Paine and Barth's remarks were

---

[68] ECF 6 ¶¶ 85, 92; ECF 7 ¶¶ 85, 92. Factual assertions in pleadings are judicial admissions conclusively binding on the party who made them. *See Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir. 1994).
[69] *See supra* Background; Ex. 1 (Barth dep. 83:3 (Paine "was a text man")); Ex. 4 (Paine dep. 93—94).

14

"threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow.'" *Blankenship*, 471 F.3d at 538 (quotations omitted).

Paine and Barth's late-hour explanation for *some* of this behavior[70]—that they were merely trying to correct "misinformation" that Webb was spreading—beggars all reasonable belief since, as Barth admitted, Defendants never even bothered to reach out to Webb directly to address their disagreement with his political speech and lobbying activities, or to use the vast public resources at their disposal at WVDE to combat speech *with more speech*[71] (Nor, it bears repeating, did they or anyone ever file a complaint with the Ethics Commission).

Instead, Paine and Barth chose to repeatedly contact and protest Webb's speech and lobbying activities *to the client who employed him, ACT*—and, perhaps more importantly, a top prospective WVDE vendor whose fortunes in West Virginia would rise or fall on the ultimate say-so of Steve Paine. (They fell). Instead of directly asking or trying to persuade Webb to change his views or lobbying activities, Defendants engaged upon a systematic pressure campaign to use his client ACT—the other party in his business relationship—to force Webb to back down.

Each time ACT officials received earfuls (or the written-form equivalent) from Paine, Barth, or both, about Webb's tweets or lobbying activities, ACT officials relayed what they heard to Webb. And in response, Webb took certain steps to reduce his exposure, lest Paine use his governmental authority to punish ACT directly in the public contracting process. Webb deleted certain social media posts (tweets) expressing views on education issues and toned future ones down.[72] As a result of Paine and Barth's pressure campaign, directed via his client ACT,

---

[70] Ex. 1 (Barth dep. 172:21-24); Ex. 4 (Paine dep. 159).
[71] Ex. 1 (Barth dep. 157:14-17); Ex. 4 (Paine dep. 127:14—128:3).
[72] Ex. 8 (Webb dep. 170: 18-22, 171:19-20, 175:13-14, 177:4-10, 229:15—230:12).

15

Webb was continuously alarmed that Paine and Barth would punish ACT using the public contracting process if Webb did not tone down his expressed views about WVDE or education policy. And it is no answer that Webb did not totally stop expressing his views on education issues in the face of Paine and Barth's pressure campaign. *Blankenship*, 471 F.3d at 532 ("A chilling effect need not result in a total freeze of the targeted party's speech.").

*Third*, there can be no genuine dispute that a "causal relationship" exists between Paine and Barth's pressure campaign against Webb and Webb's decisions to delete certain social media posts, no longer specifically mention WVDE or any of its officials in social media, and otherwise restrain his public social media postings on education policy issues. *But for* Paine and Barth's repeated and direct complaints about Webb's social media postings and lobbying activities to his client ACT, Webb would not have deleted, began to limit, or otherwise restrain or soften his social media posts about education public policy issues. Webb had no reason to delete or tone down his posts *before* Paine and Barth began their campaign. There is no evidence to even suggest any other cause. Defendants can show none.

Accordingly, Plaintiff is entitled to partial summary judgment on liability under Count I.

## II.  Paine and Barth are liable under Count II for tortious interference.

A plaintiff proves tortious interference by showing "(1) [the] existence of a contractual or business relationship or expectancy; (2) an intentional act of improper interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." *Smith v. Teach*, No. 07-49, 2009 WL 2378670, at *2 (N.D. W. Va. July 28, 2009) (quotations omitted) (citing cases).[73] Webb is also entitled to partial summary judgment on liability for this claim. *See* Fed. R. Civ. P. 56(a).

---

[73] Mr. Webb's damages, though provable, are not at issue in this motion for partial summary judgment on liability.

16

*First*, there is no genuine dispute that Webb had a business relationship with ACT, which is shown by a contract that was repeatedly extended without fail until ultimately terminated after the culmination of Paine and Barth's pressure campaign—Paine's threatening call to the ACT CEO and Webb's consequent filing of this civil action to remedy Defendants' unlawful acts.

*Second*, there is no genuine dispute that Paine and Barth—strangers to Webb and ACT's business relationship—intentionally and illegitimately interfered with it. Undisputed evidence of this interference includes the repeated calls from Paine and Barth to ACT representatives criticizing Webb; Barth's emails to ACT's competitors describing her and Paine's demand they hire a lobbyist to "neutralize," "combat," and "effectively dispatch [Webb] to the curb! Again. The sooner the better!!!"; Barth's repeated emails to ACT representatives criticizing Webb's lobbying activities on behalf of ACT; Paine's text messages to ACT representatives criticizing them for failing "to hold Webb in check," despite being "asked" by Paine to do so "on at least two occasions"; and, Paine's call disparaging Webb to the Chief Executive Officer of ACT, Inc. Not to mention, Barth's email disparaging Webb in which she asked ACT senior vice president Montgomery regarding Webb, "Who does he report to within your company?"[74]

In light of this record, Defendants cannot prove up the affirmative defense of "justification" for their intentional interference under *any* of the categories recognized by the Supreme Court of Appeals Syl. Pt. 2, *Torbett v. Wheeling Dollar Sav. & Tr. Co.*, 314 S.E.2d 166, 167 (W. Va. 1983); *id*. at 172 & notes. There is no evidence that Defendants [1] were engaged in "legitimate competition" between Webb and themselves; [2] had a "financial interest" in ACT; [3] were "responsib[le]" for ACT's "welfare"; [4] had an interest in ACT's business policies which they sought to influence; or [5] were ever "requested" by ACT to give "honest, truthful

---

[74] Ex. 5 (Barth dep. ex. 27).

17

advice" about Webb. Moreover, the explained bases for repeatedly reaching out, unsolicited, with criticism of Webb to his client ACT concerned Webb's public social media posts and lobbying activities, which are plainly protected by the First Amendment. There is nothing "proper" about interference with a business relationship by state officials when the proffered basis is the officials' strident disagreement with constitutionally protected activity.

*Third*, there is sufficient evidence that Paine and Barth's pressure campaign against Webb caused the harm sustained. Here, the harm sustained includes—at minimum—the lost consulting contract; the added day-to-day burdens and expense placed on Webb's performance of the contract prior to its termination[75]; and Webb's emotional distress and mental anguish. Paine and Barth's interference campaign caused burdens on Webb's performance of this contract for ACT because he was repeatedly telephoned and texted by ACT officials who were undoubtedly anxious about being called, emailed, texted, or all three, by Paine and Barth with harsh criticisms of Webb's expressions on social media and lobbying activities on behalf of ACT. There can be no genuine dispute that *but for* Defendants' continuous campaign of interference, Webb's performance of his contract for ACT would have been less burdensome. Summary judgment on liability for tortious intereference is apt for these reasons alone.

Worse still, ACT ultimately exercised its right to terminate the lobbying contract with Webb as a result of Defendants' campaign against him and his client. Even when pressed by defense counsel, ACT, Inc. testified that the filing of this action by Webb, seeking remedy for Defendants' bad acts and the deterioration of the relationship between ACT and WVDE (led by

---

[75] *See Restatement (Second) of Torts* § 766A (1979); *see also Smith*, 2009 WL 2378670, at *2 (applying WV law; relying on Section § 766A); *Torbett*, 314 S.E.2d at 171-72 ("rel[ying] upon the Restatement for guidance"); *see, e.g.*, *Wilspec Techs., Inc. v. DunAn Holding Grp., Co.*, 204 P.3d 69, 70 (Okla. 2009) (same; recognizing a plaintiff's right to maintain action against an interferor when wrongful acts were aimed at hindering or otherwise rendering plaintiff's performance more costly or burdensome in a contract between the plaintiff and a third party).

Paine and Barth) were factors in the termination of ACT's consulting agreement with Webb. On the other hand, ACT repeatedly and unequivocally stated that there were absolutely no performance issues or demerits of any kind concerning Webb during their entire business relationship. Finally, even apart from the destroyed business relationship, Defendants' campaign of interference caused significant emotional distress and mental anguish for Webb,[76] which Defendants cannot genuinely dispute or present evidence that it arose from any other source.

Accordingly, Plaintiff is entitled to partial summary judgment on liability under Count II.

## III.   Paine and Barth are liable under Count III for civil conspiracy.

 "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." Syl. Pt. 3, in part, *Jane Doe-1 v. Corp. of President of The Church of Jesus Christ of Latter-day Saints*, 801 S.E.2d 443 (W. Va. 2017). There is ample undisputed evidence that Paine and Barth acted in concert when violating Webb's First Amendment rights (Count I) and tortiously interfering with Webb's business relationship with ACT (Count II) and Webb is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

To begin with, Paine specifically recruited Barth, a self-described "friend" with whom he had worked previously at WVDE and later at the same private company, to rejoin the top ranks of the WVDE in early 2018 in positions for which she only reported to Paine.[77] Defendants admitted that the two of them, together, called a senior vice president of ACT several times to "object" to Webb's "lobbying" and "activities on Twitter."[78] Barth sent an email only to Paine, titled "Private – What a unsupportive vendor [sic]," in which Barth forwarded a Webb tweet,

---

[76] *See* Restatement (Second) of Torts § 774A(1)(c) (1979).
[77] Ex. 1 (Barth dep. 19:21-24, 21:8-10); Ex. 4 (Paine dep. 15:7-19); Ex. 1 (Barth dep. 41-42).
[78] ECF 6 ¶¶ 85, 92; ECF 7 ¶¶ 85, 92.

saying that Webb "undermines *our* work to get a paycheck – he is a mindless hired gun. Not to mention, this is duplicity at its best"—sentiments with which Paine does not disagree.[79]

Most critically, Paine testified that he and Barth met and discussed "a lot of tweets and posts" by Webb "that were very troublesome," which he directed she compile and bring to him,[80] and which they used to call ACT senior vice president Montgomery "to complain," in addition to the emails.[81] In short, Barth was a conduit through which Paine implemented the campaign of retaliation and interference against Webb—in addition to her own acts in violation of Webb's rights. And later, Barth emailed a lengthy compilation of Webb's tweets to Paine days before his call to the ACT CEO and texts to ACT representatives.[82]

Paine and Barth also worked together to urge the main competitor of Webb's client to hire a lobbyist for the specific purpose of assailing Webb. Barth testified that she and Paine met with College Board representatives and urged them to hire another lobbyist in West Virginia to help them combat Webb, a process on which Paine thereafter regularly sought updates from Barth.[83] And finally, Barth emailed representatives of ACT Inc.'s competitor, College Board, urging them to hire a lobbyist to "neutralize Webb and effectively dispatch him to the curb! Again. The sooner the better!!!" As she wrote, College Board bringing on a lobbyist "to combat Webb" would "make all of our lives easier, . . . [e]specially Dr. Paine's."

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's motion for partial summary judgment on liability as to each claim against the Defendants.

---

[79] Ex. 31 (Barth dep. ex. 19) (emphasis added); Ex. 1 (Barth dep. 143-52); Ex. 4 (Paine dep. 97:12—100:7).
[80] Ex. 4 (Barth dep. 126:4-9, 127:6-10, 142:15-17).
[81] Ex. 4 (Paine dep. 93—94); Ex. 19 (Barth dep. ex. 26); Ex. 5 (Barth dep. ex. 27); Ex. 1 (Barth dep. 176-79).
[82] Ex. 32 (Paine dep. ex. 7).
[83] Ex. 1 (Barth dep. 110:20—112:9, 118:12-14); Ex. 2 (Barth dep. ex. 18); Ex. 1 (Barth dep. 117:21—118:5).

Dated:  August 20, 2020                              **JASON WEBB**,

                                                     **By Counsel**


                                                     /s/ J. Zak Ritchie
                                                     J. Zak Ritchie (WVSB #11705)
                                                     Michael B. Hissam (WVSB #11526)
                                                     Andrew C. Robey (WVSB #12806)
                                                     HISSAM FORMAN DONOVAN RITCHIE PLLC
                                                     P.O. Box 3983
                                                     Charleston, WV 25339
                                                     681-265-3802 *office*
                                                     304-982-8056 *fax*
                                                     zritchie@hfdrlaw.com
                                                     mhissam@hfdrlaw.com
                                                     arobey@hfdrlaw.com