**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**Charleston Division**

**JASON WEBB,**

        **Plaintiff,**

**v.**
                                  **CIVIL ACTION NO.: 2:19-CV-447**
                                  **(Judge John T. Copenhaver)**

**STEVEN L. PAINE, State Superintendent of**
**Schools, in his individual capacity and official**
**capacity; and JAN BARTH, Assistant State**
**Superintendent of Schools, in her individual**
**capacity and official capacity,**

        **Defendants.**

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION OF STEVEN L. PAINE AND JAN BARTH FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This case is fundamentally about Plaintiff's frustration that the West Virginia Department of Education ("WVDE") awarded the bid for the statewide 11th grade assessment to College Board,[1] rather than ACT, the entity for which Plaintiff lobbied. Respectfully, ACT's grievances regarding the selection process (if any) are not for Plaintiff to assert and must not be permitted to serve as the basis for Plaintiff's suit against these Defendants. As the Supreme Court of the United States has instructed, to have standing "[t]he plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (citation omitted); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (U.S. 2016) (an injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way," and "concrete" if it

---

[1]     College Board is the entity which produces the SAT test, ACT, Inc.'s primary competitor.

is "*de facto*" – that is, it "actually exist[s]"). Thus, to the extent Plaintiff couches his arguments in *his version* of events surrounding WVDE's selection process, his lack of standing to assert them is dispositive of this litigation. Indeed, if Plaintiff's standing is not apparent "from all materials of record [after any requested supplementation], the complaint must be dismissed." *Warth v. Seldin*, 422 U.S. 490, 501-2 (1975).

Separating the wheat from the considerable amount of chaff, the claims *actually brought* by Plaintiff in his Complaint are subject to summary dismissal. Plaintiff alleges "***Violation of the First Amendment (42 U.S.C. § 1983) - Retaliation***" asserting that the Defendants "threaten[ed] Webb's client ACT with blackballing and closer governmental scrutiny of ACT bids for public contracts if ACT did not shut Webb up or fire him". [ECF 1 at ¶ 113]. Putting aside his lack of standing to claim ACT's alleged injury as his own, Plaintiff concedes that no-one from ACT asked him to cease or "tone down" his social media posts about education issues, and that was echoed by ACT's corporate representative. [Webb Dep., Ex. 1 at 175-176;[2] ACT, Inc. 30(b)(6) Dep., Ex. 2 at 43].[3] In short, *Plaintiff* never suffered a "concrete and particularized" injury to his First Amendment rights due to Drs. Paine and Barth's complaints to ACT.

Plaintiff also alleges "***Tortious Interference with Business Relationships,***" maintaining that the Defendants interfered with his "contractual or business relationship and expectancy with ACT" which caused "harm to business reputation, emotional distress, anguish, embarrassment, and humiliation." [ECF 1 at ¶¶ 127, 129]. However, ACT had advised the West Virginia Department of Education that it was unable to address Department requirements in order to move forward; a cost-driven business decision. [Ex. 3]. Around one month later, Plaintiff began this

---

[2] By relying upon various documents and things in their Motion, the Defendants in no way waive or concede the authenticity or admissibility of said documents and things.  The Defendants hereby reserve their rights to make evidentiary challenges to all testimony and documents referred to or relied upon herein.
[3] Likewise, ACT did not discipline  Plaintiff for his tweets.  [Ex. 2 at 44].

litigation and, *after* he filed this suit, ACT elected to terminate its contract with Plaintiff. [ECF 1; Ex. 1 at 212;  Ex. 2 at 53]. It is undisputed that nothing Drs. Paine and/or Barth communicated to ACT had anything to do with termination of the contract; to the contrary, ACT has testified that Plaintiff's filing of this Complaint was fundamental to its decision to terminate its contract with Plaintiff. Moreover, ACT has hired no lobbyist to replace Plaintiff and Plaintiff lost no clients as a result of the terminated contract with ACT. [Ex. 1 at 218, 219].

In short, the absence of any causal connection is dispositive of Plaintiff's First Amendment retaliation claim and his tortious interference claim. Additionally, Drs. Paine and Barth have qualified immunity from suit and the complained-of conduct was justified. Finally, as his First Amendment and tortious interference claims fail, so too does Plaintiff's derivative civil conspiracy claim. Accordingly, pursuant to *Fed. R. Civ. P*. 56, the Defendants are entitled to the summary dismissal of this case, with prejudice.

## II. BACKGROUND

### A.    IMMATERIAL FACTS

At first blush, this matter has a lengthy and complicated procedural history. However, when one eliminates the facts immaterial to the causes of action Plaintiff has actually pled, such as the legislative and request for proposal ("RFP") history of West Virginia's selection of a provider for the 11th grade assessment, it is apparent that nothing supports Plaintiff's suit against Drs. Paine and Barth. Rather, the undisputed, *material* facts show no causal connection between the complained-of conduct and the termination of ACT's contract with Plaintiff. Additionally, Drs. Paine and Barth have qualified immunity from suit, and the complained-of conduct was justified. However, given Plaintiff's 136 paragraph, 20 page Complaint, it seems prudent that the Defendants set forth the convoluted, yet wholly immaterial, factual background of this case to provide the Court with context.

#### a.      Plaintiff's Relationship with ACT:

Plaintiff Jason Webb is the sole member of his lobbying company, Capitol Advocates.  In January 2016, Capitol Advocates entered into a contract to lobby on behalf of ACT. [Ex. 1 at 196-97].  Under the contract, Capitol Advocates received a monthly retainer of $3,500. [*Id.* at 23].  Notably, at that time, neither Defendant was employed by WVDE. [*Id.* at 50] (Dr. Paine's "first day on the job" was March 27, 2017); [Barth Dep., Ex. 4 at 39] (hired in April 2018).

#### b.      2016 Legislative Session:

During the 2016 Legislative Session, HB 4024 was introduced in the House of Delegates which (if enacted) would have prohibited the then-existing Smarter Balanced[4] assessment "or any other assessment based on the Common Core Standards or Next Generation Science Standards".  [Ex. 5.  In its place, ACT would have been specifically enshrined in the State Code as the annual assessment required to be administered to high school students in West Virginia.  [*Id.*].  During that same Session, a similar companion bill, SB 676, was introduced on the Senate side, which (if enacted) would have required West Virginia schools to use ACT and ACT Aspire[5] products as the annual assessments.  [Ex. 6 at pp. 4-5].

While those bills never made it out of their respective chamber's Education Committees, Governor Tomblin vetoed a similar bill (HB 4014) in 2016 which did not explicitly name ACT or ACT Aspire, but nevertheless would have required West Virginia to adopt a testing structure resembling that of ACT's products.  [Ex. 7 at 9] (requiring tests in the five subject matter areas of English, reading, writing, science, and mathematics).  As Plaintiff informed ACT, the effect of the veto was that the "Smarter Balanced exams stay."  [Ex. 8].  These events occurred before Defendants were employed with WVDE.

---

[4] "Smarter Balanced is a summative assessment that was part of the - - sort of the Common Core movement. . . ."  [Ex. 1 at 31].  Smarter Balanced was the state-wide general summative assessment for grades 3-8.
[5] ACT Aspire is ACT, Inc.'s testing product for grades 3-8. [Ex. 1 at 17-18].

4

c.      **2017 Legislative Session:**

West Virginia's 2017 legislative session ran from February 8, 2017 through April 9, 2017. According to Webb, "[o]n February 8, 2017, the Governor received a standing ovation during the State of the State address after declaring, 'I am going to propose we throw Smarter Balance in the trash can and we go to ACT testing.'" [ECF 1 at ¶ 13]. At the February 16, 2017 meeting of the West Virginia Board of Education,[6] member Chuck Hatfield made a motion to require the WVDE to incorporate ACT and ACT Aspire in its testing program.  [Ex. 9 at 4].  WVDE, through its General Counsel Heather Hutchens, advised of procedural concerns with Mr. Hatfield's motion related to legislation.  [*Id.*]; [*cf.* ECF 1 at ¶ 18] (Plaintiff alleges *based on hearsay*, that WVDE "said that the WVBOE could not do that, and . . . should instead wait and see what action was taken by the Legislature in its then-ongoing legislative session."). At this point, neither Drs. Paine nor Barth were yet with WVDE – indeed, Dr. Michael Martirano was Superintendent of Schools. [Ex. 9].

1.      *HB 2711 and SB 18:*

HB 2711 was introduced in the Legislature on February 27, 2017 by Speaker Armistead and Delegate Miley "By Request of the Executive" (*i.e.,* the Governor). [Ex. 10]. This bill did not specifically identify ACT as the state assessment, nor did it require separate test areas. [Ex. 1 at 48]. On March 23, 2017, however, the House Education Committee amended the bill (similar to HB 4014 the prior year) to specifically enumerate tests of five separate subject matters, aligned with the structure of ACT. [*Id.*; ECF 1 at ¶ 47]. According to Sarah Stewart, WVDE's counsel for government affairs, HB 2711 "was the governor's education bill. It touched many areas of education. . . ." including fundamental structural changes, such as "the elimination of OEPA [the

---

[6] The Constitutionally-established West Virginia *Board* of Education is a separate and distinct entity from the statutorily-created West Virginia *Department* of Education, for which Drs. Paine and Barth work(ed).

Office of Education Performance Audits], the elimination of RESAs [Regional Education Service Agencies], the establishment of education service cooperatives . . . ."  [Stewart Dep., Ex. 11, at 39]. Ms. Stewart believes that the intent of the assessment portion of the bill was to change from an annual assessment to mirror the federal requirements. [*Id.*].

Ms. Stewart advised that SB 18, which (like HB 4024 and SB 676 the previous year) would have specifically named ACT in State Code as the assessment provider, was "rolled into [HB] 2711" but the "bill went to a subcommittee . . . [which] determined that it was inappropriate to name a vendor in a statute, and recommended to the full Senate Education Committee that . . . the 11th grade assessment be procured via an RFP process." [*Id.* at 47-48].

At some point, the language in the assessment portion of HB 2711 reverted from the five separate subject areas to the original general language.  Plaintiff asserts that the *WVDE* suggested the change "including . . . removing the five subject matter components of the assessment contained in the House version" which "would effectively have allowed the Department to more easily select the SAT as the statewide assessment – and not the ACT". [ECF 1 at ¶ 47]. Notably, however, Plaintiff bases these allegations solely on *hearsay and speculation*. [Ex. 1 at 81] ("that's what Senator Mann represented to you. You were not present for that meeting. A: That's correct."). In reality, the reversion in the assessment language of the bill to the general language from the introduced version – language which predated Dr. Paine's employment as Superintendent -- was requested by the Governor's Office. [Ex. 11 at 42-44].[7]  HB 2711, with the assessment language reverted back to the Governor's originally introduced version, was signed into law by the Governor on April 26, 2017.  [ECF 1 at 53].

---

[7]     WVDE did have correspondence with the Governor's Office on HB 2711.  As e-mail correspondence and track changes to the draft bill show, however, WVDE's suggestions ***did not touch on the assessment language*** of the bill.  [Ex. 12].  Yet the Governor's Office's suggested version reverted to the earlier, generalized, testing language. [Ex. 13, at Bates No. D_025473, subsection (3)].

6

### 2.    SB656

Senate Bill 656 was a data privacy bill, which (if enacted) would have allowed the prevailing statewide testing vendor to sell data of students as young as 15 years old as part of the Educational Opportunity Service ("EOS"). [*See, e.g.,* Hutchens Dep., Ex. 14 at 35-36]; [Ex. 15]. Under EOS, the assessment vendor is paid by the information recipient for receipt of the information. [Ex. 1 at 92]. Plaintiff asserts, *based solely upon hearsay*, that College Board (SAT) had an issue with the bill. [*Id.* at 95]. WVDE did not support the bill, stating its belief that "permitting the sale of student data in code by certain vendors is inappropriate," and noted that any data-related concerns could be corrected in the RFP process. [Ex. 15]. Governor Justice vetoed the bill, stating that it "does not include appropriate privacy safeguards and, therefore, I disapprove and return Enrolled Committee Substitute for Senate Bill 656." [Ex. 16].

Irrespective of the fact that veto of the bill would have affected *both* ACT and SAT equally, if either won the RFP contract,  Plaintiff concocts a wholly speculative conspiracy theory because he supposedly learned, *through hearsay*, that SAT opposed the bill and newly appointed superintendent Dr. Paine expressed opposition to it. [*See, e.g.,* Ex. 1 at 97]. Nevertheless, again based solely on this *hearsay*, Plaintiff asserts that Dr. Paine "was upset" that Plaintiff was advocating for SB 656 and told another lobbyist that ACT "better get a handle" on him or "ACT will never get anything in West Virginia." [*Id.* at 99].

### d.    2017 RFPs for Statewide Assessments:

According to Plaintiff, "[o]n May 12, [2017], the Department released its RFP for statewide assessments". [ECF 1 at ¶ 54]. There were two (2) RFPs. The testimony of Dr. Vaughn Rhudy, Executive Director of the WVDE Office of Assessment, provides some background on the RFPs. The first RFP was for a grades 3 through 8 assessment. The second RFP was for an assessment for

high school (11th grade). [Rhudy Dep. , Ex. 17 at 24]. Each RFP had two parts: a technical proposal and a cost proposal. [*Id.* at 25].

Both ACT and SAT responded to the 11th grade RFP; however, *both* entities missed "mandatories" and were disqualified. [Ex. 17 at 31]. *Dr. Paine was not involved in review of the RFP responses.* [*Id.* at 33]. *Dr. Barth was not involved in the RFP process at all, because she was not an employee of the WVDE at the time.* [Ex. 11 at 16]. When notified by the WVDE that the RFPs were canceled, Chris Kratzer, the Senior Director of U.S. Government Relations for ACT's response was "WTF? We will need an explanation of this." [Ex. 18]. Due to both bidders missing "mandatories," the WVDE went "back and look[ed] at the draft . . . RFP, and then . . . had to reissue a new RFP and notify all of the vendors" with both the RFPs for the 11th grade assessment, and the 3rd through 8th grade assessment. [Ex. 17 at 31-32].

In August 2017, vendors resubmitted their RFP proposals and College Board (SAT) prevailed with regard to the 11th grade assessment. [Ex. 17 at 33-34; Ex. 19].[8] ACT made a Freedom of Information Act request for SAT's bid and WVDE's scoring of it, [Ex. 20], and filed a formal protest.[9] WVDE then conducted "an extensive analysis of the bid response by ACT. Approximately 15 points were restored [to ACT] as a result that review process. However, ACT still did not obtain . . . the minimum required score to be considered." [Ex. 14 at 24]. After that, "no further action was taken by ACT" after the protest was denied. [*Id.*]. Plaintiff regards the rescoring as "highly suspicious," [ECF No. 1. at ¶ 69][10] but, again, Plaintiff has no standing to

---

[8] Those involved with reviewing the RFP responses were Sarah Stewart, Heather Hutchens, Lou Maynus, Dr. Vaughn Rhudy, Timothy Butcher, Andrea Lemon, and JoAnn Adkins.  [Ex. 11 at 16].
[9] The Protest contained 2 primary grounds: (1) only ACT's bid supposedly adequately addressed WVDE's requirement for a science assessment; and (2) there were alleged inconsistent point deductions that ACT maintains should have also disqualified SAT.  [Ex. 21].
[10] Plaintiff equally inexplicably states, without any factual basis, that he "believed then and believes now that the Department's scoring was prejudiced against ACT based on the circumstantial evidence."  [ECF 1 at ¶ 70].

question WVDE's scoring of ACT's 2017 bid.  Most importantly, ACT could have appealed the

denial of the protest outside the review of the WVDE, *but chose not to*. [Ex. 2 at 174-75].

Plaintiff's reaction to the RFP result was to make a satirical "tweet" and tag[11] the WVDE:

> I put on Twitter the second scene in the original 'Ghostbusters' movie where
> Bill Murray's character, whose name was Professor Venkman . . . was
> conducting an ESP test where he had a coed with blonde hair to his right
> and a shorter, littler guy with dark hair to his left, and he would hold up a
> card and ask them if they could tell him what the shapes were. When he
> would ask the coed what the shapes were, she would be absolutely wrong,
> and he would be astonished and give her points for it. When the other guy
> guessed and got it right, he would say, 'No,' and he would shock him with
> a little buzzer.

[Ex. 1 at 140-141]. Dr. Rhudy testified that the tweet left him "offended. I felt that it was insulting

my integrity, and I didn't appreciate it, and I thought it was unprofessional." [Ex. 17 at 49].

### e.   Local Option (2018): SB 532

Even after not prevailing on the RFP for the statewide 11th grade assessment, there was

still an opportunity for ACT to be used by the counties through the "local option." As Dr. Rhudy

testified, the "local option" procedure is provided in the federal Every Student Succeeds Act

("ESSA") of 2015. After SAT was selected as the statewide 11th grade vendor, WVDE began to

explore the "local option" as provided in the ESSA to give local districts a choice to offer the ACT

as their 11th grade assessments.  However, as Dr. Rhudy testified, the ESSA procedure is lengthy

and complicated, intertwined in federal law, regulation, and interaction with the U.S. Department

of Education.  Notably, the procedure requires a "peer review" process, and other requirements

that must adhere to federal regulation and guidance and required submissions from both WVDE

and ACT.  [Ex. 17 at 69-73].  Dr. Paine was contacted by Scott Frein, a national lobbyist for ACT,

and Scott Montgomery of ACT "and asked for the ability for ACT to be able to become a local

option in" West Virginia "school districts" and Dr. Paine indicated that he "was very enthusiastic

---

[11] On Twitter, a "tag" is an affirmative action which sends a notification to the person or account that is "tagged" –
here, WVDE.

about paving the way for that partnership to exist between [WVDE] and ACT and [West Virginia] districts". [Paine Dep., Ex. 22 at 73].

According to Plaintiff, "[o]n January 28, 2018, Paine contacted the Senior Vice President for State and Local Programs at ACT . . . . Paine told the Senior VP for Programs that Webb's public criticism of Paine and his Department related to the RFP process was 'getting under his skin' and that ACT needed to 'handle it or else.'" [ECF 1 at ¶ 80]. Again, however, this assertion is based upon *hearsay*. [Ex. 1 at 150-51]. Plaintiff produced a text message sent to him from Chris Kratzer of ACT which purports to document that "Paine contacted Scott M late last week. You are severely under his skin and making him nervous. Let's talk this week." [Ex. 23]. While he does not recall this event, Dr. Paine advised that he "may have expressed concern about Mr. Webb's lobbying. Because of the very, very hard work of establishing confidence in our system, I may have said something like that." [Ex. 22 at 71-72].

In fact, Plaintiff's tweets (described below) were disquieting to many at the WVDE. According to Dr. Barth, one tweet, which she emailed to ACT, implied that West Virginia homeschooled students were leaving public schools because of Common Core, and painted the SAT (ACT's competition, which had recently prevailed on WVDE's statewide 11th grade assessment RFP) as a Common Core test. [Ex. 4 at 144]. Dr. Barth noted that ACT indicated on its web site that it, too, was a Common Core assessment, and that she simply wanted Plaintiff "to be more accurate and tell both sides of the story". [*Id.* at 144, 182].

Plaintiff alleges *through hearsay* that, during this time frame, Dr. Paine met with Senators Mann and Rucker, who were interested in legislation giving the counties a "local option." [Ex. 1 at 155]. Dr. Paine does not recall this meeting, but if it occurred, surmises that (consistent with Dr. Rhudy's account of the lengthy federal local option process) he would have likely "explained to them the direction [the WVDE] was moving with the national people of ACT, that [the WVDE

10

was] going to ask the U.S. Department of Education for an amendment to our accountability plan which would allow districts to have the choice. That was something that the governor, the State Board of Education, and certain members of the Legislature strongly supported." [Ex. 22 at 73-74].

As to Legislative action in 2018, Senator Rucker introduced SB 532, which would have required the Board of Education to develop a process allowing local education entities (*i.e.*, counties) to select either the ACT or SAT as an 11th grade assessment.  [Ex. 24 at 5].  Plaintiff alleges *through hearsay* that Senator Mann pulled the bill as a result of Dr. Paine promising that the WVDE "can and will do this themselves" and "[s]tarting next year [2019], the assessment test will be county choice between ACT or SAT." [ECF 1 at ¶¶ 82-84].  As WVDE counsel for government relations, Sarah Stewart, testified, "[t]he position [of WVDE] was we did not need legislation to allow counties to pursue the locally selected option." [Ex. 11 at 70].

In December of 2018, Mr. Kratzer tells Plaintiff via text message "Jan and Steve are monitoring your tweets. Congratulations!" [Ex. 25]. Plaintiff does not know how Mr. Kratzer came upon this information. [Ex. 1 at 169]. Critically, Plaintiff asked ACT "Want me to stop? I will" and ACT responded "***No, your views are your views. You bashed the SAT as a common core test. You didn't bash WVDOE . . . directly.***" [Ex. 25] (emphasis added).[12] Plaintiff stated in his Complaint and confirmed at deposition that nobody at ACT directed him to "delete, stop, or limit" his tweets. [Ex. 1 at 176]; [ECF No. 1 at ¶ 91]. ACT's corporate representative independently confirmed that ACT never suggested or directed Plaintiff to alter his Twitter postings,[13] nor did it discipline Plaintiff with regard to his tweets. [Ex. 2 at 43, 44].

---

[12] Mr. Kratzer further advised  Plaintiff "Make sure you continue to lay low.  The dragon is awake and he has you in mind" to which  Plaintiff responded "Wtf".  [Ex. 26].

[13] Chris Kratzer said that he *personally* suggested Plaintiff  not be specific about the WVDE in his Twitter posts.  [Ex. 2 at 41].  Mr. Kratzer also testified that his suggestion was *not* a result of Drs. Paine's and Barth's complaints, [*Id.* at 154] and that he would have made that suggestion irrespective of them. [*Id.* at 155].

**f.** **Plaintiff's "tweets":**

With so much discussion predicated upon Plaintiff's "tweets," it is helpful to keep in mind the sarcastic, derisive nature of those social media posts directed toward WVDE. For example, Plaintiff tweeted:

- "#ACT #Science consists of answering 40 questions in 35 minutes. SAT science doesn't consist of anything because it doesn't test for science. Don't ask the #Dept of Ed that question because they #knew that answer and still got it #wrong." [Ex. 27].

- When tweeting about an article regarding SAT's alignment to state standards, Plaintiff tweeted "Oh btw, the SAT doesn't really test for science" and used the hashtag "#STEMless". [Ex. 28]. In another tweet, Plaintiff wrote "Q. What percent of the SAT covers the science section? A: Zero! They don't have a #science section. It's simply based on the #commoncore standards." [Ex. 29]. And "Q: What does the SAT science look like? A. Silly rabbit, SAT doesn't have a science section. #tricksareforkids". [Ex. 30].

- "Since the adoption of #CommonCore standards by the #WestVirginia State board of #Education, math scores keep going down". [Ex. 31].

- When tweeting about Dr. Barth's proclamation regarding census statistics, Plaintiff stated "#BreakingNews . . . the Dept. had to recess again for another proclamation." [Ex. 32].

- Further criticizing WVDE's adoption of then-prevailing federal Common Core standards, Plaintiff tweeted "State Board has already let them dodge achievement. Might as well go for broke!" and "there are now at least THREE #COMMONCORE[14] supporters who serve on the #WV State Board of #Education. That should give everyone great pause! Unless, of course, you are one of those who #supports the #failing standards, curriculum and assessments that go along with them." [Ex. 33]. As well as "The last time this happened they adopted #CommonCore standards and #SmarterBalanced assessments. Wasted tens of millions of dollars and hurt student performance." [Ex. 34]. And  "Glad to hear that the #wvsenate President ditched the #commoncore approach submitted by the Dept in favor of a more permanent solution to the #math problem!" [Ex. 35].

---

[14] It is important to also keep in mind that ACT touted itself as an "active partner" in developing Common Core "since its inception," and "strongly endorse[d]" it.  [Ex. 38]; *ACT Supports Common Core State Standards*, Statements of Support, The Common Core State Standards Initiative (last retrieved Aug. 20, 2020) http://www.corestandards.org/assets/ccsi_statements/StatementACT.pdf.  Indeed, it has been observed in the education industry that despite the fact that "ACT was part of the group who designed the Common Core," ACT became hesitant to reference its alignment to Common Core "since the standards have been controversial."  *See, e.g.*, Halle Edwards, *Is the ACT Changing Because of the Common Core?*, PrepScholar (Sept. 26, 2015 1:30 PM), https://blog.prepscholar.com/is-the-act-changing-because-of-common-core.

In short, given the generally prevailing political climate disliking Common Core, Plaintiff chose to malign WVDE and SAT (recently selected as as West Virginia's 11th grade statewide assessment) by denigrating them as "Common Core" while omitting ACT's like alignment.

- "So…the Dept is just now acknowledging we have a problem??? I guess the first step is admittance. Many of us have known about the problem for 20 years. Glad to see them finally do it. Just need 20 more for them to figure out what to do next." [Ex. 36]. "#Failing ACT Scores Are #CommonCore's #Failure…Should have called it #RaceToTheBottom" *Id.*

- When sharing an article about the Kentucky Board of Education's graduation requirements, Plaintiff stated " '[r]ather than celebrate our high school graduation rate, we should hang our heads in shame that what we've given to many students is a certificate of attendance.' *Reminds me of another state*." [Ex. 37] (emphasis added).

- "BREAKING NEWS: Dept. of Ed has a plan to improve scores, which is different from last year's plan, which is different from the year before and the year before that and the year before that and the year before that and the year before that . . . Version 20.0". *Id.*

- Plaintiff's vilification expanded beyond WVDE and labeling the SAT test itself as "Common Core," to encompass discrediting College Board, the entity which produces the SAT. In one tweet regarding an article about a student accused of cheating on her SATs, Plaintiff sated "So remember kids, don't improve your #SAT score too much when you retake it, especially if you are a #minority, or the #CollegeBoard will try to invalidate it and your dreams!" [Ex. 39]. In another, "The question of how the #CollegeBoard has continued to bounce back from #scandal after #scandal in a way that most other organizations in its position could not." [Ex. 40].

Plaintiff sees something nefarious in WVDE gathering his disparaging "tweets" about it, but that "assembly," without more, is quite benign. As Dr. Paine testified, Dr. Barth "came to my office and told me that there were a lot of tweets and posts that her staff brought to her attention, that were very troublesome to them and that were troublesome to [Barth], and so I said, 'Well, then why don't you put them together and let me take a look at them?'" [Ex. 22 at 93].

### g.   Local Option (Again – 2019): SB 624

During the 2019 Legislative Session, Senator Rucker introduced SB 624, which effectively copied SB 532 from the previous year in that it would have required the Board of Education to develop a process allowing counties to select either the ACT or SAT as an 11th grade assessment. [Ex. 41 at 5].  Plaintiff has implied *based on hearsay and speculation* that SB 624 was the result of Dr. Paine breaking his alleged "promise" to Sens. Mann and Rucker the previous year that the local option would be implemented. [ECF 1at ¶ 84].  As Dr. Paine explained, "the reason we didn't

meet the timeline was something that we were not aware of when that statement to Senator Mann was given.  There were all kinds of procedural technicalities that we had to comply with that were requirements of the U.S. Department of Education, and psychometric procedures and guidelines and others that I'm just not familiar with, and, as I understand, that was the reason why we couldn't get all of that done in time.  We didn't know it at the time that we gave Senator Mann the statement."  [Ex. 22 at 77-78].

As Sarah Stewart testified, the WVDE's view of SB 624 was the same as with the nearly-identical SB 532 the previous year: "the Department's position from the beginning [was] that this bill was not necessary. Again, [the local option] is provided in . . . federal law" but that, given that the bill appeared likely to run, Ms. Stewart did engage in conversations "to get it in the best form possible so that should it pass and become law that it . . . was something that . . . we could implement." [Ex. 11 at 89]. Heather Hutchens further stated that, in addition to SB 624 being redundant to the existing federal process, "there was a cost issue involved" and that WVDE's "concern" was that it "was not going to be held responsible for costs that [it] didn't think [it] should have to pay." [Ex. 14 at 86]. Hailee Mason, lobbyist for College Board (SAT), testified about additional concerns with the legislation:

> I expressed concerns that we had a contract that would be in jeopardy if the
> bill was passed and I would ask often the department's position on the bill
> and express the College Board's position on the bill. . . .

[Mason Dep., Ex. 42 at 12]. In fact, College Board (SAT) separately wrote Governor Justice asking that SB 624 be vetoed for that reason. [Ex. 43]. In the end, Governor Justice vetoed SB 624, stating in his veto message:

> Enrolled Committee Substitute for Senate Bill 624 is concerning because it
> directly conflicts with West Virginia Code § 18-2E-5(d)(7) and would put
> the WV Board of Education in the untenable position of having to decide
> which statute to follow. WV Code § 18-2E-5(d)(7) requires that 'the
> comprehensive statewide assessment adopted prior to the testing window of
> the 2017-2018 school year shall continue to be used for at least a total of

14

four consecutive years.' By allowing county boards of education to utilize an alternative assessment option during the period of time implicated in the statute for at least a four-year period of assessment consistency, the WV Board of Education would be violating their statutory mandate already in effect.

Having a statutory conflict in place in the provision of statewide assessment, would not only cause confusing between county boards of education but could encourage litigation between counties and the state in an attempt to address the conflict. Further, the statutory conflict could give rise to contractual litigation between the state and the current vendor of the statewide contract, who was chosen by a competitive bid process, and any other vendor able to provide an alternative assessment option.

Additionally, the West Virginia Department of Education recently received a letter from the United States Department of Education (USDE) advising that the ACT assessment was conditionally approved to be used as a locally selected assessment in lieu of the statewide assessment. The letter was accompanied by a specific list of items the WV Department of Education is required to submit to receive full USDE approval. Not only does the USDE's letter render SB624 unnecessary but given the clear set of instructions provided to the WV Department of Education, there is no need to add unnecessary language that may work to impede on the WV Department of Education's ability to adhere to those instructions.

[Ex. 44].[15]

### h.    Plaintiff's reported disparaging comment about Dr. Paine:

In February of 2019, Chris Kratzer of ACT asked  Plaintiff via text message "*Are you DOE bashing again?*" and Plaintiff's response implies the affirmative. [Ex. 45 (emphasis added)].[16] According to Ms. Stewart, Delegate Cooper advised her that Plaintiff "was suggesting that Doctor Paine received inappropriate monetary benefits as a result of awarding the contract to SAT." [Ex. 11 at 52]. Dr. Barth likewise indicated that she heard Delegate Bibbee ask Hailee Mason, lobbyist for SAT, if Dr. Paine "was taking things he wasn't entitled to take", suggesting "Doctor Paine was taking kick backs of some type" from SAT. [Ex. 4 at 154]. Heather Hutchens further testified that

---

[15] Dr. Paine disputes Plaintiff's assertion that he asked for SB 624 to be vetoed, [Ex. 22 at 174], but that fact is immaterial; Plaintiff has no standing to assert that veto of SB 624 would have harmed ACT (if, indeed, it even did).
[16] A February 11, 2019 tweet of Plaintiff's stated "After listening to much of the discussion, it seems obvious to that the @wvlegislature should change the state's Constitution when it comes to #education!  Too much power vested in Unelected #Bureaucrats that have shown their collective #inability to deliver better results!"  [Ex. 46].

"Senator Rucker, the Senate Education Committee, also raised those issues". [Ex. 14 at 50]. Mr. Kratzer of ACT advised Plaintiff that Dr. "Paine is asking if either you or Rucker are spreading rumor that he had some benefit from CB RFP award." [Ex. 47]. As a result of the reported comments about kickbacks, Dr. Paine texted ACT employees that Plaintiff "has accused me of a serious allegation and I have three legislators who will stand behind being told I was receiving a kickback according to Webb. This cannot be allowed to continue and must be addressed strongly." [Ex. 48]. As Dr. Paine testified, "[t]his was not a personal matter until I was what I perceived to be pulled into this thing by a comment about me receiving compensation from the College Board. I thought that went too far". [Ex. 22 at 118].[17]

Dr. Paine requested a telephone call with Marten Roorda, the CEO of ACT, Inc. That call took place on March 5, 2019 and, as Mr. Roorda recalled the conversation in an e-mail, "[h]e [Dr. Paine] only addressed the role of Jason Webb, who he said has a bad reputation and insulted him for receiving a kickback fee from the CB. . . . I advised him to file a complaint with the Ethics Board." [Ex. 49]. Mr. Roorda was also under the impression that Dr. Paine suggested that "the issue with Webb could have implications" on business that WVDE may have with ACT in the future, and that WVDE's counsel "said that regulations for purchase practicing could effect [*sic*] the way they chose vendors."  [*Id*.].  Mr. Roorda seemed to view this as "sort of a threat. And I don't like it."  [*Id*.].

However, as WVDE's General Counsel, Heather Hutchens (a participant in the call) clarified the discussion that was had during the phone call:

> The topic of the accusation that we had heard had been made against Steve Paine was the substance of the telephone call. To me, if accurate, incorrect information that reflects poorly upon the Department of Education and any of our ethical standards, or any of the accuracy of information we provide to the legislature, to the extent that the legislature believes that we are not

---

[17] Dr. Paine was troubled by the accusation and advised ACT that it had "a very shady, dishonest lobbyist in Webb who has attacked my personal integrity and as a constitutional officer I take that very seriously."  [Ex. 50].

credible in any way, that impacts us in all legislation. Not specifically legislation with ACT.

In other words, if there's an allegation made against the Department of Education about one of our employees involved - - being involved in potentially illegal behavior, and members of the legislature believes that, it's my opinion that that will be, in essence, held against us throughout the entire legislative process, much of which involves funding that goes not to the Department of Education, but out to school students.

And as counsel, I'm always on guard and vigilant that all of the information that we convey to the legislature about any - - and it is conveyed about us to the legislature is accurate information so that we remain in good standing with them, and that nothing jeopardizes any of the bills that we would like to see pass to benefit children, or receive funding that we believe benefit children. So that is important to me.

[Ex. 14 at 77-78]. Ms. Hutchens plainly states that "[t]here was no threat made on the call."[18] [*Id.* at 72]. Rather, "Doctor Paine indicated that there could be a time in the future when West Virginia was doing business with ACT, and . . . it would be more uncomfortable if there were someone who was conveying false information about the state superintendent or the Department. . . ." [*Id.* at 67]. Indeed, Ms. Hutchens' contemporaneous notes document that statement. [Ex. 51] ("makes us uncomfortable to think that we would in future be working w/ someone who doesn't share our ethical standards").

### i.  ACT terminates legislative work in West Virginia and, accordingly, its agreement with Plaintiff

When Plaintiff entered into his agreement with ACT in 2016, he was paid $3,500.00/month. [Ex. 1 at 23]. In 2018, that compensation was reduced to $3,000.00/month. [*Id.* at 203]. Plaintiff testified that this reduction came from ACT budget cuts as it was getting involved in several states and trying to manage its expenses. [*Id.*]. ACT confirms that the reduction was in no way disciplinary. [Ex. 2 at 30].

---

[18]     Even if there had been a threat toward ACT (which there wasn't), Plaintiff – again – has no standing to claim ACT's grievances (if any) against Dr. Paine as his own.

Meanwhile, through 2018 and 2019, the WVDE had continued working on the "local option" through the federal ESSA process. [Ex. 52]. However, when Dr. Rhudy attempted to schedule a call with ACT to discuss "local option" issues, ACT's Gretchen Guffy informed Dr. Rhudy on May 2, 2019 that ACT "determined that the requirements laid out by WVDE to allow districts to select the ACT in lieu of the SAT starting in the 2019-20 school year contain items that ACT is unable to address in the manner or form you suggest." [Ex. 53].[19] ACT confirmed at deposition that Ms. Guffy's e-mail signaled ACT's *choice* to cease following up with WVDE on implementing the "local option." [Ex. 2 at 50]. Throughout this time, Plaintiff remained contracted with ACT. [*Id.* at 50-51].

Plaintiff filed this lawsuit on June 12, 2019. [ECF No. 1]. One week later, ACT provided Plaintiff with notice of the termination of the lobbying agreement, effective thirty days from the Notice. [Ex. 54]. In fact, the decision to terminate the contract was made during that 1-week period. [Ex. 2 at 56]. According to ACT, Plaintiff's lawsuit was a consideration in that termination.[20] [*Id.* at 53]. As ACT's corporate representative testified "[t]here was a general feeling amongst those folks at ACT, myself included, that there was too much reference to ACT in the complaint and that this was a local matter that did not need to involve ACT." [*Id.* at 54]. *ACT has testified, under oath, that* <u>*nothing*</u> *Drs. Paine or Barth communicated to ACT played any role in its decision to terminate the lobbying agreement with Plaintiff.* [*Id.* at 57].

---

[19] As elaborated by Chris Kratzer on behalf of ACT, the WVDE asked ACT "to absorb the cost of standard study and achievement and achievement level descriptors and customized score reports, in addition to . . . the department also requested that ACT pay for an alignment study." [Ex. 2 at 128]. He acknowledges that, because ACT was not the statewide vendor, there were "some very distinct differences" in what it would have to do to qualify as the local option. [*Id.* at 129-30].

[20] Other considerations were the changing political landscape and ACT's perceived inability to move forward with local choice. [Ex. 2 at 61]. Which, as described by Mr. Kratzer, was a cost-driven business decision. *See n. 19, supra.*

ACT has not hired a lobbyist to replace Plaintiff. [Ex. 1 at 218]; [Ex. 2 at 70]. Plaintiff has lost no other clients as a result of ACT's cancellation of his contract. [Ex. 1 at 219]. On February 21, 2020, Dr. Paine resigned as Superintendent due to his wife's health concerns. [Ex. 22 at 202].

**B.    MATERIAL FACTS**

The immaterial facts are abundant and Plaintiff attempts to use them to paint an unpleasant picture of Drs. Paine and Barth. Respectfully, however, there is no cognizable cause of action for being unpleasant. Plaintiff cannot bring suit because he and Dr. Paine did not get along. Plaintiff cannot bring suit because ACT was not successful in the RFP process. Plaintiff cannot state a claim as a result of public officials, performing their discretionary duties, collecting his disparaging social media posts to review them. The *material* facts are few and undisputed, as follows:

- No one at ACT advised Plaintiff to stop tweeting, to tone down his tweets, or delete his tweets. [Ex. 1 at 175-76; ECF 1 at ¶¶ 91, 95].[21] Dr. Paine did not ask ACT to discipline or terminate Plaintiff. [Ex. 2 at 142].

- Drs. Paine and Barth did not ask ACT to terminate its contract with Plaintiff, nor did they have any agreement to interfere in that relationship. [Ex. 4 at 225-226]. Rather, ACT terminated the relationship with Plaintiff after consideration of a number of factors, including Plaintiff's filing this lawsuit. [Ex. 2 at 53]. Nothing that Drs. Paine or Barth communicated to ACT played a role in ACT's termination of its contract with Plaintiff. [*Id.* at 57].

- Plaintiff lost no clients as a result of the termination of his agreement with ACT and the filing of this lawsuit. [Ex. 1 at 219].

- According to Dr. Barth, it was within her discretionary authority to collect Plaintiff's "tweets" as they contained misinformation that needed corrected. [Ex. 4 at 224]. Additionally, it was within Dr. Barth's discretionary authority to contact Plaintiff's supervisor at ACT to advise of Plaintiff's publicizing misinformation on social media. [*Id*].

---

[21] Chris Kratzer said that he *personally* suggested Plaintiff not be specific about the WVDE in his Twitter posts. [Ex. 2 at 41]. Mr. Kratzer also testified that his suggestion was *not* a result of Drs. Paine's and Barth's complaints, [*Id.* at 154] and that he would have made that suggestion irrespective of them. [*Id.* at 155].

Boiling out all the immaterial "noise," these four (4) simple facts are legally dispositive of all claims made in Plaintiff's one hundred thirty-six (136) paragraph complaint. It is without question that the Defendants are entitled to summary judgment.

### III.    DISCUSSION

### A.    THE STANDARD FOR SUMMARY JUDGMENT.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). As the Fourth Circuit noted in *Sheridan v. Nationwide Retirement Solutions, Inc.*:

> The relevant inquiry in a summary judgment analysis is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'

313 Fed. Appx. 615, 2009 WL 465100 (4th Cir. Feb. 25 2009) (unpublished) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The non-movant's burden when confronted with a properly supported motion for summary judgment cannot be understated. As the Southern District has noted:

> Once the moving party has met its burden, the burden shifts to the nonmoving party to 'make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof 'necessarily renders all other facts immaterial.' *Id.* at 323.
> '[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.' *Liberty Lobby*, 477 U.S. at 256. 'The mere existence of a scintilla of evidence' in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether 'the jury could reasonably find for Plaintiff.' *Id.* at 252.

*Mollohan v. Warner*, 2017 WL 1217204 (S.D. W. Va. March 31, 2017) (slip opinion).

Summary judgment is particularly appropriate herein as  Plaintiff is attempting to pursue claims for which he has no standing (and cannot sustain the claims he actually has made). As the

20

District Court for the District of Massachusetts eloquently noted "[s]tanding is generally a dispositive legal issue because if Plaintiff lacks standing, the entire case must be dismissed." *In re Advanced RISC Corp.,* 317 B.R. 455, 456 (D. Mass. 2004) (citing *Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 892 F.Supp. 347, 361 (D.N.H.1995)).

**B.    AS A MATTER OF LAW, THE UNDISPUTED, MATERIAL FACTS FAIL TO ESTABLISH A VIOLATION OF THE FIRST AMENDMENT.**

In order to state a claim of First Amendment retaliation under Section 1983, a plaintiff must establish: (1) that he engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected his First Amendment rights; and (3) there was a causal relationship between his protected activity and the defendant's conduct. *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (citations omitted). The undisputed, material facts herein fail to satisfy an essential element of Plaintiff's claim as there was no action that adversely affected his First Amendment Rights. Summary judgment is, therefore, essential. *See, e.g., Hamilton v. Mayor & City Council of Baltimore*, 807 F.Supp.2d 331, 351 (D. Md. 2011) (Causation may be decided on summary judgment "when there are no causal facts in dispute.' *Love–Lane v. Martin*, 355 F.3d 766, 776 (4th Cir.) (citation omitted), cert. denied, 543 U.S. 813, 125 S.Ct. 49, 68, 160 L.Ed.2d 18 (2004).").

"'The causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [government official] would not have taken the alleged retaliatory action.'" *Tobey v. Jones*, 706 F.3d 379, 390 (4th Cir. 2013) (quoting *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990)). As the Court noted in in *Hamilton, supra*, '[i]t is also clear that plaintiff's 'speech' (i.e., her complaint about overtime abuse) did not cause her termination. The requirement of causation is ' 'rigorous' in that the protected expression must have been the 'but for' cause of the adverse employment action alleged.'" *Hamilton, supra* at 351 (citing

*Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 318 (4th Cir.2006)).  As commentators have indicated, "[t]o withstand summary judgment, therefore, an employee must produce evidence linking the employer's action to the employee's speech. ***Speculation or hunches amidst rumor and innuendo will not suffice. Nor can a plaintiff sustain his burden simply by showing that the elimination of the protected activity may have been welcomed by the defendant.***" 5 Emp. Coordinator Emp. Practices § 1:20 (emphasis added). Here, Plaintiff admits, even averred in his Complaint, that ACT did not ask him to "tone down" or delete his social media posts, and that critical fact was echoed by ACT. [Ex. 2 at 43]. In fact, Chris Kratzer of ACT told Plaintiff *not* to do so[22] and seemingly encouraged Plaintiff's "tweets". [*See* Ex. 25] ("*No, your views are your views. You bashed the SAT as a common core test. You didn't bash WVDOE . . . directly.*") (emphasis added). In short, it is undisputed that there was no concrete, particular injury-in-fact to Plaintiff's First Amendment rights caused by Drs. Paine's and Barth's alleged complaints to ACT.

## C.   AS A MATTER OF LAW, THE UNDISPUTED, MATERIAL FACTS FAIL TO ESTABLISH TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP.

Without factual basis, Plaintiff alleges Drs. "Paine and Barth intentionally, improperly, and tortuously interfered with Webb's business relationship and expectancy with ACT. . . ." [ECF 1 at ¶ 128]. The testimony of ACT's corporate representative unquestionably disposes of this claim. [*See* Ex. 2 at 155] ("Q. Did Paine and Barth's frequent complaints. . . criticizing Jason to AC[T] officials - - did it place a strain on the working relationship between ACT and Jason? A. From my perspective, no."); [*Id.* at 142] ("Q: Did Steve Paine attempt to pressure ACT to discipline Jason Webb? . . . THE WITNESS: To my knowledge, Steve Paine never requested any disciplinary action against Jason Webb."); [*Id.* at 57]. ("Q: . . . Did anything that Dr. Paine may have

---

[22] Chris Kratzer said that he *personally* suggested Plaintiff not be specific about the WVDE in his Twitter posts.  [Ex. 2 at 41].  Mr. Kratzer also testified that his suggestion was *not* a result of Drs. Paine's and Barth's complaints, [*Id.* at 154] and that he would have made that suggestion irrespective of them. [*Id.* at 155].

communicated to ACT regarding Jason Webb have any part in . . . ACT's decision to terminate the consulting agreement? A: No."); ("Q: Did anything that . . . Dr. Barth may have communicated with ACT regarding Jason Webb have any part in ACT's decision to terminate he consulting agreement? A: No."). Given this testimony, the inquiry ends here, and summary judgment is appropriate on the tortious interference claim.

To state a claim of tortious interference, a plaintiff must establish: (1) existence of a contractual or business relationship expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages. Syl. Pt. 2, *Corbett v. Wheeling Dollar Sav. & Trust Co.,* 173 W.Va. 210, 314 S.E.2d 166 (1983). If a *prima facie* case is made, "a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper. *Id.*

It is clear that "[t]ortious interference requires a purposeful wrongful act without justification or excuse." *Water Engineering Consultants, Inc. v. Allied Corp.*, 674 F.Supp. 1221, 1224 (1987) (citation omitted). The third element is one of causation. As this Court has noted, "some link between the challenged conduct and the harms alleged is a necessary element" of a tortious interference claim, and failure to establish that link is critical at the summary judgment stage. *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F.Supp.2d 873, 883-4 (S.D. W.Va. 2014) (citations omitted); *see also Firebird Structures, LLC v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1505*, 252 F.Supp.3d 1132, 1165 (D.N.M. 2017) ("Neither New Mexico nor, to the Court's knowledge, any other jurisdiction recognizes a claim for attempted

tortious interference."). Moreover, the expectancy must be just that, an expectancy, and cannot be mere speculation. *See Kerr v. Marshall Univ. Bd. of Gov.*, 824 F.3d 62, 77 (4th Cir. 2016).

The decision of *Williams v. Seneff* is instructive. 342 F.3d 774 (7th Cir. 2003). In *Williams*, the Assistant Chief of Police (Mr. Williams) was fired after a comment to the media. The Court recognized that "South Bend Mayor Stephen Luecke, then St. Joseph County Prosecuting Attorney Christopher Toth, and Fraternal Order of Police ("F.O.P.") Lodge 36 President Joseph Lauck [had] expressed displeasure and exerted pressure on Sheriff Seniff to fire Mr. Williams. These individuals admit that they called Sheriff Seniff to express their displeasure with Mr. Williams' comment, but the defendants deny that they requested that Sheriff Seniff fire Mr. Williams." *Id.* at 779 (footnote omitted). According to the Court, "[w]ith respect to the claim against Mr. Toth, the evidence simply establishes that Mr. Toth called Sheriff Seniff to complain, for we have determined that Alan Lieb's testimony that Mr. Toth was 'involved with the termination' is not sufficient evidence from which to infer Mr. Toth's participation in the alleged conspiracy to influence the Sheriff's termination decision. Moreover, Sheriff Seniff's affidavit testimony that he alone made the decision to terminate Mr. Williams is uncontradicted . . . . We cannot conclude that this evidence is sufficient to support a finding of an intentional inducement of the breach of an employment contract." *Id.* at 793.

Here, at best the evidence reflects that Drs. Paine and Barth contacted ACT to express their displeasure about Plaintiff's conduct. ACT has testified that Dr. Paine never requested that Plaintiff be disciplined.  [Ex. 2 at 142]. It is undisputed that Plaintiff's decrease in compensation had nothing to do with Drs. Paine's and Barth's complaints. ACT testified that its cancellation of Plaintiff's contract had nothing to do with Drs. Paine's and Barth's complaints. [*Id*. At 57]. There is absolutely no evidence of the required causation. *See Wood v. Fox Broadcasting Sub., Inc.*, 129 Cal.App.4th 344, 356 (Cal. 2005) ("An essential element of a contract interference claim is proof

that the defendant's conduct actually disrupted or breached  Plaintiff's contract") (citations omitted); 44B Am.Jur.2d *Interference* § 12 ("If a plaintiff cannot show that damage to his or her rights or obligations under a contract proximately resulted from the third party's alleged interference, the claim for tortious interference with contract fails as a matter of law.").

### D.   EVEN IF PLAINTIFF COULD ESTABLISH THE ELEMENTS OF HIS TORTIOUS INTERFERENCE CLAIM, SAID CLAIM FAILS AS THE DEFENDANTS' ACTIONS WERE TRUTHFUL AND JUSTIFIED.

With regard to Plaintiff's tortious interference claim, commentators have noted that "[o]nce a plaintiff has established the elements, the burden generally shifts to the defendant to show that the actions were justified. The determination of whether the defendant has established justification has been said to be basically a process of balancing numerous factors, including the nature and purpose of the interference as distinguished from the nature of the expectancy interfered with." AM. LAW OF TORTS § 31:86. Truthful information is "*an absolute bar to a claim of tortious interference* 'whether or not the information is requested.'" *Tiernan v. Charleston Area Med. Ctr., Inc.*, 506 S.E.2d 578, 593 (W. Va.1998) (emphasis added). Moreover, a privilege exists "to protect a person for whose welfare the interferor is responsible." AM. LAW OF TORTS § 31:86.

Plaintiff maintains that Drs. "Paine and Barth intentionally, improperly, and tortuously interfered with Webb's business relationship and expectancy with ACT by repeatedly contacting and threatening ACT with adverse public action if ACT did not limit Webb's ability to lobby for his client or fire him." [ECF No. 1 at ¶ 128]. Initially, Plaintiff's averment is indisputably false. The corporate representative for ACT testified that Drs. Paine and Barth did not request that Plaintiff be disciplined, [Ex. 2 at 142], and that nothing that Drs. Paine and Barth communicated to ACT played a role in its termination of its agreement with  Plaintiff. [*Id.* at 57]. Additionally, by forwarding Plaintiff's own "tweets" to ACT, Dr. Barth provided nothing to ACT that was untrue.

Regardless, the actions of Drs. Paine and Barth were justified. As Dr. Paine testified, "[t]his was about the work of the Department of Education, about the students and the parents and the educators in West Virginia. It was about trying to restore confidence in a public education system that had lost confidence. It was about trying to do the very, very best for children, and at some point in time positive things need to be said and heard and believed about those people you're serving so that they can feel good about themselves." [Ex. 22 at 100-101]. Dr. Paine further elaborated, "[t]here was so much criticism of our system, yes, it was my job to try to build up the system and try to build some positive momentum amongst all of the people that I would call the stakeholders of the system." [*Id.* at 101-02]. Similarly, Dr. Barth testified that it was within her discretionary authority to collect Plaintiff's "tweets" as they contained misinformation that needed corrected. [Ex. 4 at 224]. Additionally, it was appropriate for her to contact Plaintiff's supervisor at ACT to advise of Plaintiff's publicizing misinformation on social media. *Id.* In sum, in addition to the undisputed fact that the information Drs. Barth and Paine communicated to ACT was truthful, it is unquestionable that the Defendants were justified in their acts and Plaintiff's tortious interference claim fails.

**E.     AS A MATTER OF LAW, THE UNDISPUTED, MATERIAL FACTS FAIL TO ESTABLISH A CLAIM FOR CIVIL CONSPIRACY.**

**a.     Plaintiff's "anchor" claims fail; so, too, does his derivative conspiracy claim.**

Plaintiff's final claim alleges that Drs. "Paine and Barth unlawfully conspired to harm Webb." [ECF No. 1 at ¶ 133]. Because Plaintiff's "anchor" claims fail, so does his civil conspiracy claim. "A civil conspiracy is not a per se, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." *Dunn v. Rockwell*, 689 S.E.2d 255, 268 (W. Va. 2009) (citing *Kessel v. Leavitt*, 511 S.E.2d 720, 754 (W. Va.1998)) (additional citations omitted); *see also Bennett v. Skyline Corp.*, 52 F.Supp.3d

796, 813 (N.D. W. Va. 2014); 24 CAUSES OF ACTION 2d 603 (2012) ("[T]here is no civil action based on the conspiratorial agreement alone . . . . although civil conspiracy has its own elements that must be plead and proven, it is not a separate and distinct action. Rather, it serves to hold the conspirators jointly and severally liable for the underlying act.")

Notably, "[w]here this Court has found summary judgment for the defendants on the underlying tort claims to be proper, we have held that a plaintiff's claim for civil conspiracy must also fail." *Piraino Bros., LLC v. Atlantic Financial Group, Inc.,* 211 N.C. App. 343, 712 S.E.2d 328, 333-4 (2011) (citations omitted); *Hibbs v. Berger*, 430 S.W.2d 296, 320 (Mo. 2014) ("'If the underlying wrongful act alleged as part of a civil conspiracy fails to state a cause of action, the civil conspiracy claim fails as well.' . . . Therefore, a case will be dismissed if a plaintiff fails to plead a cause of action for the underlying tort.") (citations omitted), Because the undisputed, material evidence disposes of Plaintiff's underlying First Amendment and tortious interference claims, his derivative claim of civil conspiracy fails as well.

> **b.**      **Plaintiff cannot establish the elements of a civil conspiracy claim.**

The "elements" of a claim for civil conspiracy are (1) an association of two or more persons; (2) an unlawful objective; (3) an agreement or understanding with regard to the objective and the manner in which it was to be achieved; (4) commission of an unlawful, overt act in furtherance of the conspiracy; and (5) injury as a result of the overt act. 24 CAUSES OF ACTION 2d 603 (2012). Even if this claim could stand apart from the "anchor" claims (which it cannot), Plaintiff has failed to satisfy the elements of it. At best, the evidence in this case shows that Drs. Paine and Barth complained to ACT about Plaintiff's "tweets" and rumors that he might have disparaged Dr. Paine. This simply does not satisfy elements (2), (3), and (4). Indeed, as Dr. Barth testified, she did not have any "understanding" with Dr. Paine aimed at the objective of interfering with Plaintiff's relationship with ACT, nor did she personally intend that result. [Ex. 4 at 225].

Nor can simple complaints be considered an "unlawful, overt act." Finally, as has been discussed throughout this brief – *the undisputed evidence shows that Plaintiff never suffered any concrete, particular injury-in-fact as a result of Drs. Paine's and/or Barths communications with ACT.* Therefore, Plaintiff has failed to establish element (5), as well.

## F.     THE DEFENDANTS ARE ENTITLED TO DISMISSAL OF PLAINTIFF'S CLAIMS IN ACCORDANCE WITH THE DOCTRINE OF QUALIFIED IMMUNITY.

In *Pearson v. Callahan*, 555. U.S. 223, 231 (2009), the Supreme Court of the United States said "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Importantly, "[q]ualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government officials error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (citations omitted). Critically, "[b]ecause qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . *it is effectively lost if a case is erroneously permitted to go to trial.*'" *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1995)).

According to the Fourth Circuit Court of Appeals:

> To determine whether an officer is entitled to qualified immunity, courts engage in a two-step inquiry set forth by the Supreme Court in *Saucier*. The first step is to determine whether the facts, taken in the light most favorable to the non-movant, establish that the officer violated a constitutional right. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. At the second step, courts determine whether that right was clearly established. *Id.*.

*Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016). In the second step, there must be a determination of "whether the right at issue was 'clearly established' at the time of the events in question."

*Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014) (citations and footnotes omitted). As to the claims alleged by Plaintiff, qualified immunity has been raised in defense of a First Amendment claims, *see, e.g., Reichle v. Howards*, 566 U.S. 2088, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012), tortious interference with contract claims, s*ee, e.g., Albright v. Charlotte-Mecklenburg Bd. of Educ.*, 2017 WL 6028362 (W.D. N.C. Dec. 5, 2017) (unpublished), and civil conspiracy claims, *see, e.g., Bradford v. Huckabee*, 330 F.3d 1038 (8th Cir. 2003). As Dr. Barth testified:

> I believed that a person working for the West Virginia Department of Education I was in my realm of obligation certainly and responsibility to let [Plaintiff's] immediate supervisor or a supervisor know of what was happening and sending him the particular tweet that Scott fully understood that was Common Core and it was bias in the public.

[Ex. 4 at 224-5]. In short, it was entirely reasonable for Drs. Paine and Barth to believe it necessary to advise ACT of Plaintiff's conduct as it was misinformative and potentially detrimental to West Virginia students, teachers, and the WVDE's relationship with the state legislators, where schools receive their funding. Consequently, Drs. Paine and Barth are entitled to qualified immunity.

## IV. CONCLUSION

Plaintiff has spent 136 paragraphs of the Complaint, 10 depositions, and 50,000 pages of documents attempting to establish his subjective perception of discord between ACT and WVDE. However, ACT's dispute – if it has one -- is not Plaintiff's to prosecute. Plaintiff simply has no standing to pursue any arguments ACT may have regarding its nonselection as a test provider in West Virginia, whether statewide or "local option." In actuality, Plaintiff is using the convoluted political background and selection of the statewide testing provider in 2017 as a smokescreen to disguise the fact that *he has no claims of his own to pursue*. The only relevant facts surrounding this case are Plaintiff's issue with the Defendants' complaints to ACT about his "tweets." ACT, however, never asked Plaintiff to stop tweeting, delete them, or tone them down. Plaintiff seeks damages for termination of his contract with ACT. ACT, however, has testified that it terminated

the contract for reasons unrelated to the Defendants' complaints -- including how prominently Plaintiff displayed ACT in this suit.

   **WHEREFORE**, for the foregoing reasons, the Defendants, Dr. Steven L. Paine and Dr. Jan Barth, respectfully request this Court grant them summary judgment on Plaintiff's Complaint and dismiss this civil action, with prejudice.

**STEVEN L. PAINE**
**and JAN BARTH,**

**By Counsel,**

/s/ Jan L. Fox
Jan L. Fox, Esq. (WV Bar #1259)
Mark C. Dean, Esq. (WV Bar #12017)
STEPTOE & JOHNSON PLLC
Chase Tower, 17th Floor
P. O. Box 1588
Charleston, WV 25326-1588
Telephone: 304-353-8000

STEPTOE & JOHNSON PLLC
Of Counsel

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**JASON WEBB,**

      **Plaintiff,**

**v.**                                      **CIVIL ACTION NO.: 2:19-CV-447**
                                             **(Judge John T. Copenhaver)**

**STEVEN L. PAINE, State Superintendent of
Schools, in his individual capacity and official
Capacity; and JAN BARTH, Assistant State
Superintendent of Schools, in her individual
Capacity and official capacity,**

      **Defendants.**

## CERTIFICATE OF SERVICE

      I hereby certify that on the 21st of August, 2020, I served copy of "**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF STEVEN L. PAINE AND JAN BARTH FOR SUMMARY JUDGMENT**" upon the following counsel of record via the CM/ECF system:

> J. Zak Ritchie
> Michael B. Hissam
> Andrew C. Robey
> Hissam Forman Donovan Ritchie PLLC
> P.O. Box 3983
> Charleston, WV 25330
> *Counsel for Plaintiff*

> /s/ Jan L. Fox
> Jan L. Fox, Esq. (WV Bar #1259)
> Mark C. Dean, Esq. (WV Bar #12017)