UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


JASON WEBB,

       Plaintiff,

v.                             Civil Action No. 2:19-cv-00447

STEVEN L. PAINE, State
Superintendent of Schools, in
his individual capacity and
official capacity; and JAN
BARTH, Assistant State
Superintendent of Schools, in
her individual capacity and
official capacity,

       Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


       Pending are plaintiff Jason Webb's motion for summary judgment, filed August 20, 2020, ECF No. 68, and defendants Steven L. Paine and Jan Barth's motion for summary judgment, filed August 21, 2020.  ECF No. 70.


I.    Background


       Plaintiff is a registered lobbyist in West Virginia who was hired by the national testing company ACT, Inc. ("ACT") to provide lobbying services in West Virginia, with the contract being entered into on January 25, 2016 for a period of six months.  Webb Dep., ECF No. 68-8 at 196:13-197:13.  The contract

between plaintiff and ACT was continually extended until July 2019.  Id. at 218:3-10.  Defendant Paine was Superintendent of Schools, from March 27, 2017 until February 21, 2020.  Paine Dep., ECF No. 68-4 at 18:7-14, 202:9-13.  Defendant Barth began work as a special assistant in mid-April 2018, being promoted to Assistant Superintendent of Schools on July 1, 2018.  Barth Dep., ECF No. 68-1 at 39:10-21.

In 2016, prior to defendants arriving at the West Virginia Department of Education ("WVDE"), legislation was introduced in both chambers of the legislature that would have enshrined ACT as the chosen provider of educational assessments in West Virginia.  Prior to being replaced, the Smarter Balanced test, an assessment of Common Core standards produced by a partnership between the Smarter Balanced Assessment Consortium and the American Institute of Research ("AIR"), was the statewide assessment for students in West Virginia.  ECF No. 68-8 at 32:9-22; see also AIR, AIR Partners with Smarter Balanced Assessment Consortium to Create an Online Test Delivery System for States, https://www.air.org/resource/air-partners-smarter-balanced-assessment-consortium-create-online-test-delivery-system (Sep. 6, 2012).  Senate Bill 676 would have expressly made ACT the provider for students in grades 3-8 and the 11th grade, and House Bill 4024 would have expressly made ACT the

provider for the 11th grade test only.  ECF Nos. 70-5, 70-6.
Neither bill advanced from its respective chamber; however, a
similar bill, House Bill 4014, would have required West Virginia
to adopt a test with the exact testing structure of ACT's
products by requiring that the test assess the five subject
matter areas contained in the ACT exam, consisting of English,
reading, writing, science, and mathematics.  ECF No. 70-7.  HB
4014 was passed by both chambers and vetoed by Governor Tomblin
in 2016.  Id.

On February 27, 2017, a sweeping education bill, House
Bill 2711, was introduced in the House "by request of the
Executive," i.e., by the request of newly elected Governor
Justice.  ECF No. 70-10.  The House Education Committee amended
the language of the bill to require the statewide 11th grade
assessment test for the five subject areas contained in the ACT
test.  Id.; see also ECF No. 68-8 at 39.  Senate Bill 18,
introduced around the same time as HB 2711, originally named ACT
as the assessment provider, but the Senate Educational Committee
determined it would be inappropriate to name a specific provider
and that the assessment should be decided through the normal
bidding process.  Stewart Dep., ECF No. 70-11 at 47-48.  The
amended language calling for the five components contained in
ACT's products was removed when HB 2711 arrived in the Senate.

ECF No. 70-10.  Plaintiff testified that Senator Kenny Mann, the
Chair of the Senate Education Committee, informed him that while
he wanted the ACT test to be the statewide assessment, Paine had
represented to him that removing the pro-ACT language would not
damage ACT's chances of being selected.  ECF No. 68-8 at 70:20-
71:20.  Sarah Stewart, in-house counsel for WVDE, believes that
it was in fact the Governor's request that the language be
removed that led the Senate to do so.  ECF No. 70-11 at 42-44.
Regardless of the hearsay statements attributed to Mann and
Stewart's belief, it is noted that HB 2711 was enacted into law
on April 26, 2017, opening a selection process for an assessment
for grades 3-8 and the 11th grade, without language that
specifically favored ACT.  See 2017 W.V. HB 2711.

    Subsequently, WVDE opened a public bidding process for
two statewide assessments: one for students in grades 3-8, and
one for students in the 11th grade.  Rhudy Dep., ECF No. 70-17
at 24.  ACT placed a bid to provide its "ACT Aspire" exam for
grades 3-8 and its ACT test for 11th grade students.  Id.  ACT's
primary competitor, the College Board, submitted the only other
bid for the 11th grade assessment, with its SAT test.  Id.  at
32.  AIR submitted a bid for grades 3-8, with the Smarter
Balanced test.  ECF No. 68-8 at 132.  After bids were submitted,
a blackout period began, in which communications between vendors

and WVDE were prohibited to maintain integrity in the bidding process.  Id. at 117.  Plaintiff testified that despite the blackout, Paine approached him at an event for school administrators on June 20, 2017 and told him "we are not going to use that — that 3-8 [test], that Aspire. That's junk," and then walked away.  Id. at 118-19.  Paine testified that he did not recall such an encounter and that he seriously doubted he would say something to that effect.  ECF No. 68-4 at 55-57.

In the late summer of 2017, both the ACT test and the SAT test were disqualified in their initial bids with the WVDE, as both vendors' applications were missing mandatory portions in order to be considered.  ECF No. 70-17 at 31.  Accordingly, the WVDE opened a second bidding process, in which College Board and ACT submitted applications again for consideration for the 11th grade exam.  Id.  The College Board, with its SAT test, was awarded the contract for the 11th grade assessment in the rebidding.  Id.  ACT filed an official protest with the scoring process, contending that (1) only the ACT adequately addressed the WVDE's requirement for a science assessment and (2) certain points were improperly deducted from ACT and, if those deductions were applied equally, it would have resulted in the SAT being disqualified.  ACT Protest, ECF No. 70-21.  WVDE then reanalyzed and rescored ACT's bid, which resulted in ACT being

awarded an additional 15 points but still falling short of the minimum score of 50 to be considered as an option.  Hutchens Dep., ECF No. 70-14 at 24.  ACT did not exercise its right to appeal this decision to the state circuit court.  ECF No. 68-8 at 130.  Thus, the College Board remained the winner of the bidding process for the 11th grade test.  ECF No. 70-14 at 24. ACT lost the bid for the assessment of grades 3-8 to AIR.  ECF No. 68-8 at 132-33.  ACT did not formally protest the award of the bid to AIR.  Id.

Even though ACT was not selected as the statewide provider for either assessment, it still had the opportunity to be selected as an assessment provider on the county-level under a policy known as the "local option."  The local option procedure is provided for under the Every Student Succeeds Act (ESSA), a federal law passed in 2015.  See Pub.L. No. 114-95. According to Dr. Vaughn Rhudy, Executive Director of the WVDE Office of Assessment, the procedure provided for under ESSA is lengthy and complicated, requiring interaction with federal regulators and federal law, as well as a peer-review process and required submissions.  ECF No. 70-17 at 69-73.  Paine testified that ACT nonetheless expressed interest in pursuing the local option, through Scott Frein, a national lobbyist for ACT and Scott Montgomery, a Vice President of ACT.  ECF No. 68-4 at 73.

Paine likewise expressed enthusiasm for working with ACT to provide a local option.  Id.  A collaborative process between ACT and WVDE to prepare for the peer-review process required by ESSA ensued between May 11, 2018 and May 2, 2019.  See ECF No. 70-52.

On February 13, 2018, Senate Bill 532 was introduced, which would have required WVDE to develop a process for providing a local option to counties of either the SAT or the ACT for the 11th grade assessment.  ECF No. 70-24.  Plaintiff testified that Chairman Mann informed him that Paine had met with Chairman Mann and Senator Rucker to advise them that the WVDE could and would give counties the power to opt for whichever test they preferred in Spring 2019, and that SB 532 was thus unnecessary.  ECF No. 68-8 at 155.  Paine testified that he did not recall this meeting, but if it happened, he likely would have informed the senators that WVDE was already seeking approval from the U.S. Department of Education for the local option.  ECF No. 68-4 at 73-74.  Regardless of the hearsay statement attributed by plaintiff to Chairman Mann, it is noted that Mann pulled the bill and read a statement drafted by WVDE on the floor of the Senate, stating that counties would have the choice between the SAT and the ACT starting in 2019.  ECF No. 68-4 at 76:15-77:5.  In 2019, the legislature passed Senate Bill

624, which would have created a local option.  ECF No. 70-41.
WVDE took the position that SB 624, like SB 532, was unnecessary
given the federal process for approving the local option.  ECF
No. 70-11 at 89.  Governor Justice vetoed the bill on March 27,
2019, reasoning that it conflicted with another statute that
required the statewide assessment selected in the 2017 bidding
process be used for at least four years.  ECF No. 70-44.

        Throughout the time he was under contract with ACT,
plaintiff utilized the social media platform Twitter to publicly
express his views about the policymaking process outlined above
and about testing policy in West Virginia.  He criticized the
selection of the SAT multiple times, calling the SAT a "Common
Core" test[1] and noting the fact that the test lacks a science
portion.  ECF Nos. 70-27, 70-29, 70-30.  He condemned the
College Board as scandal ridden.  ECF No. 70-39, 79-40.  Several
of his posts criticized WVDE and its members for supporting
Common Core standards, which he contended were failing students
and wasting money.  ECF Nos. 70-33, 70-34, 70-35.  Other posts
by him blamed low test scores in West Virginia on WVDE.  ECF

---

1 The Common Core State Standards Initiative (CCSSI) is an
educational initiative to modify how English language arts and
mathematics are taught in grade school.  See CCSSI, About the
Standards, http://www.corestandards.org/about-the-standards/
(last visited December 30, 2020).  The Common Core standards are
controversial and reference to the SAT as a Common Core test was
ostensibly a criticism.  See ECF No. 68-1 at 107.

Nos. 70-36, 70-37.  These posts were generally satirical or sarcastic in tone.

According to Barth, several employees within WVDE took notice of the posts and expressed frustration with them, as they considered the posts to be inflammatory, misleading, and unfairly critical.  ECF No. 68-1 at 141-42.  Defendants testified that they felt similarly about the posts.  Id. at 107; ECF No. 68-4 at 67.  Plaintiff testified that Paine contacted Scott Frein, ACT's national lobbyist, in late 2017 to inform him of plaintiff's social media posts and to request that ACT "get a handle on" plaintiff or they will "never get anything in West Virginia."  ECF No. 68-8 at 99.

Plaintiff testified that Paine called ACT's Scott Montgomery on January 28, 2018 to complain about plaintiff's criticism of the bidding process.  Id. at 150-51.  According to plaintiff, Paine stated that plaintiff was "getting under [his] skin" and stating that ACT needed to "handle it or else."  Id. Paine testified that he does not recall that phone call, though a January 28, 2018 text message from Chris Kratzer, ACT's Senior Director of U.S. Government Relations, to plaintiff documents that "Paine contacted Scott M late last week.  You are severely under his skin and making him nervous."  ECF No. 70-22 at 71, ECF No. 70-23.

9

Barth sent an email on December 18, 2018 to ACT containing another posting by plaintiff, indicating that she wanted plaintiff "to be more accurate and tell both sides of the story." ECF No. 68-1 at 182. In late 2018, Paine directed Barth to compile plaintiff's social media posts, and numerous WVDE personnel were involved in the compiling of the posts. ECF No. 68-1 at 142. The compilations, running numerous pages, were sent to ACT representatives. Id. at 160, 164—179. Barth testified that they did not compile posts by any other lobbyists or individuals, nor did they criticize any other lobbyists to their employers. Id. at 127.

In December of 2018, ACT's Kratzer informed plaintiff via text message that "Jan and Steve are monitoring your tweets. Congratulations!" ECF No. 70-25. Plaintiff asked Kratzer, "Want me to stop? I will," to which Kratzer replied "No your views are your views. You bashed the SAT as a common core test. You didn't bash WVDOE . . . directly." Id. Kratzer advised plaintiff to "Make sure you continue to lay low. The dragon is awake and he has you on his mind." ECF No. 70-26. Kratzer also advised plaintiff to tone down his social media posts, particularly when posting about WVDE. Kratzer Dep., ECF No. 70-2 at 41, 154. Kratzer believes he would have made this

suggestion even if he had not received frequent complaints from defendants.  Id. at 154-55.

In March 2019, WVDE's counsel, Sarah Stewart, informed Paine that a Delegate had told her that plaintiff had "stated or implied" to the Delegate that Paine was receiving inappropriate benefits from the College Board.  ECF No. 68-4 at 110.  Paine demanded a call with the CEO of ACT, Marten Roorda, to discuss plaintiff's alleged conduct.  Id. at 118-19.  Paine did not investigate the accuracy of the hearsay rumor by either contacting the Delegate or plaintiff.  Id. at 112-13.  The call with Roorda took place on or around March 5, 2019.  Id. at 121. On the morning before the call, Paine sent a series of text messages to Montgomery and Frein, criticizing ACT for not holding "Webb in check" and expressing frustration with Webb. ECF No. 68-3.

Though Paine had insisted that Roorda be alone on the call, Paine had in-house counsel, Heather Hutchens and Sarah Stewart, on the call.  ECF No. 68-4 at 118, 123-24.  On the call, Paine told Roorda that plaintiff "had a bad reputation" and that Paine was insulted by plaintiff saying he had received a kickback.  ECF No. 68-6.  Roorda indicated that he had not heard any complaints regarding plaintiff and that Paine should bring his concerns to the Ethics Board.  Id.  According to

Roorda, Paine said that "WV may be doing business with ACT in the future and indicated that the issue with Webb could have implications." Id. Hutchens then stated that purchasing regulations could affect the selection of vendors in future business with ACT and that Webb's conduct "may come close to actual slander." Id. Roorda interpreted the conversation as "a sort of a threat" and that he thought such a threat might be illegal. Id. Heather Hutchens testified that no threat was made on the call and that the accusation against Paine was the substance of the call. ECF No. 70-14 at 72, 77-78. She stated that Paine informed ACT that they would be doing business in the future and that it would be made "more uncomfortable if there were someone who was conveying false information about the state superintendent or the Department of Education." Id. at 67. Plaintiff learned of the call through Montgomery sometime after the call but could not remember when. ECF No. 68-8 at 179-80.

Even after Governor Justice's veto on March 27, 2019 of SB 624, which would have required a local option, ACT continued to work into early May of 2019 on a local option with WVDE. ECF No. 70-52. ACT eventually determined that it would be unlikely to meet the requirements set out in WVDE's plan for federal peer-review and terminated their administrative efforts to provide a local option, signaling that decision to WVDE on

May 2, 2019 by an email from Gretchen Guffy of ACT to Rhudy.
ECF No. 70-53.  ACT stated in the email that (1) a
"comparability study between the ACT Science test and the SAT
science cross-test score is not possible given the two
completely dissimilar constructs" and (2) ACT was "unwilling to
absorb the additional costs of standard setting, achievement
level descriptors and customized score reports," which was some
of the additional evidence required by the U.S. Department of
Education.  Id.  The email concluded, "[g]iven this decision, we
don't believe a call is necessary," being in response to Rhudy's
request for a conference call.  Id.  Rhudy testified that the
peer-review process generally takes "a couple of years."  70-17
at 73.

     Plaintiff filed this action on June 12, 2019.  Compl.,
ECF No. 1.  Kratzer testified as ACT's corporate deponent that
ACT decided to terminate its lobbying contract with plaintiff in
the week between June 12 and June 19, 2019.  ECF No. 70-2 at 56.
On June 19, 2019, ACT notified plaintiff by letter that it was
exercising its right to terminate the lobbying contract with
plaintiff, effective thirty days thereafter.  ECF No. 70-54.
Kratzer stated in his deposition that ACT based its
determination to terminate the contract on three considerations:
the filing of this lawsuit by Webb, the "political landscape"

13

changing in the West Virginia legislature, and the fact that ACT was "getting nowhere" with regard to the local option.  ECF No. 68-7 at 60-61.  Kratzer testified that nothing the defendants may have communicated to ACT regarding plaintiff had a part in ACT's determination to terminate the contract.  Id. at 57.

Plaintiff brought three causes of action in his complaint: Section 1983 – First Amendment Retaliation (Count I), Tortious Interference with Business Relations (Count II), and Civil Conspiracy (Count III).  ECF No. 1.  Both parties move for summary judgment on all three counts.

## II.  Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts
. . . must be viewed in the light most favorable to the party
opposing the motion." United States v. Diebold, Inc., 369 U.S.
654, 655 (1962).  A party is entitled to summary judgment if the
record, as a whole, could not lead a rational trier of fact to
find for the non-moving party.  Williams v. Griffin, 952 F.2d
820, 823 (4th Cir. 1991).  Conversely, summary judgment is
inappropriate if the evidence is sufficient for a reasonable
fact-finder to return a verdict in favor of the non-moving
party.  Anderson, 477 U.S. at 248.

## III. Discussion

### A. Count I: Violation of Plaintiff's First Amendment Rights

#### 1. First Amendment Violation

Plaintiff alleges that defendants engaged in a
continuous retaliatory campaign against plaintiff for exercising
his First Amendment free speech rights on social media.  ECF No.
1 at ¶113.  He also alleges that defendants threatened to
blackball ACT and to increase scrutiny on any future bids by ACT
if they did not either curtail plaintiff's speech in relation to
education issues and vendors or terminate him as their lobbyist.
Id.  A claim for First Amendment §1983 retaliation requires that
the plaintiff demonstrate: (1) that the speech was protected,

(2) "that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech," and (3) "that a causal relationship exists between [plaintiff's] speech and the defendant's retaliatory action." <u>Suarez Corp. Indus. v. McGraw</u>, 202 F.3d 676, 686 (4th Cir. 2000).

### a. <u>Whether Plaintiff's Speech Was Protected</u>

There is no genuine dispute of material fact that Webb's social media posts or his lobbying activities generally are protected by the First Amendment.  While defendants highlight the derisive tone and allegedly misleading nature of plaintiff's social media posts, Defs.' Mot. Summ. J., ECF No. 71 at 12, they never contest that the posts fall within First Amendment protection.  The posts at issue all involved matters of public concern, relating to issues of education policy and policymakers.  Such commentary falls squarely within the protections of the First Amendment.  <u>N.Y. Times Co. v. Sullivan</u>, 376 U.S. 254, 270 (1964) (There is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."); <u>see</u> <u>Brinkman v. Budish</u>, 692 F. Supp. 2d 855,  862 (S.D. Ohio 2010) ("Lobbying the government falls within the gambit of protected First

16

Amendment activity.") (citing <u>F.T.C. v. Superior Court Trial</u> <u>Lawyers Ass'n</u>, 493 U.S. 411, 426 (1990), <u>Roberts v. U.S.</u> <u>Jaycees</u>, 468 U.S. 609, 622 (1984)).  Plaintiff has established the first element of the claim.

> b. <u>Whether Defendants' Conduct Adversely Affected</u>
> <u>Plaintiff's Right to Free Speech / Standing</u>

Both motions for summary judgment center on the second element, whether defendants' conduct "adversely affected" plaintiff's First Amendment rights.  Defendants cast their argument for summary judgment in terms of the merits of the claim, as well as a claimed lack of Article III standing.  ECF No. 71 at 22 ("In short, it is undisputed that there was no concrete, particular injury-in-fact to Plaintiff's First Amendment rights caused by Drs. Paine's and Barth's alleged complaints to ACT."); <u>see also</u> <u>id.</u> at 20 ("Plaintiff is attempting to pursue claims for which he has no standing.").  Defendants appear to both move the court to dismiss the case for lack of subject matter jurisdiction because plaintiff lacks standing and to address the merits of the second <u>Suarez</u> element.

As it relates to the merits of the second <u>Suarez</u> element, the Fourth Circuit has explained that "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from

the exercise of First Amendment rights," an objective test.
Constantine v. Rectors and Visitors of George Mason University,
411 F. 3d 474, 500 (4th Cir. 2005) (citations omitted).  A
retaliation "cause of action targets conduct that tends
to chill such activity, not just conduct that freezes it
completely."  Id.  (emphasis in original).  Still, "[n]ot every
restriction is sufficient to chill the exercise of First
Amendment rights, nor is every restriction actionable, even if
retaliatory."  DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir.
1995); see also The Baltimore Sun v. Ehrlich, 437 F.3d 410, 416
(4th Cir. 2006) (contrasting actionable adverse impacts with de
minimis inconvenience).

A plaintiff may make out a claim for retaliation based
on the defendant's speech alone, but he bears a heavy burden in
doing so.  See Page v. Lexington, 531 F.3d 275, 287 (4th Cir.
2008) ("The needs of effective governance command that the bar
limiting government speech be high") (quoting Kidwell v. City of
Union, 462 F.3d 620, 626 (6th Cir. 2006)); see also Int'l Ass'n
of Machinists & Aerospace Workers v. Haley, 482 F. App'x 759,
765 (4th Cir. 2012).  Thus,

> [w]hen the challenged government action is government speech,
> there is no retaliation liability — even if the plaintiff can
> demonstrate a substantial adverse impact — unless the
> government speech concerns "private information about an
> individual" or unless it was "threatening, coercive, or

intimidating so as to intimate that punishment, sanction, or
adverse regulatory action will imminently follow."

Baltimore Sun, 437 F.3d at 417.  Here, the court considers
whether (1) defendants' communications with ACT officials were
threatening, coercive, or intimidating as to intimate that
punishment, sanction, or adverse regulatory action would
imminently follow and (2) whether such a threat would deter a
person of ordinary firmness from exercising his First Amendment
rights.

Plaintiff contends that the complaints lodged by Paine
and Barth amounted to threats of punishment, sanction, or
adverse regulatory action against ACT, in what he calls a
"pressure campaign against Mr. Webb via his client ACT,
comprised of a series of acts — the admitted calls, the emails,
and the text messages to ACT personnel — all highly critical of
Mr. Webb and constantly implying that ACT (as a prospective WVDE
vendor) needed to take action against him."  Pl.'s Reply, ECF
No. 75 at 5.  Paine's communications with ACT, when taken
together, could be fairly construed as a threat of imminent
punishment, sanction, or coercion against ACT if it failed to
discipline or terminate plaintiff.  Paine contacted
representatives of ACT on numerous occasions to complain about
plaintiff, allegedly informing Scott Montgomery on a January 28,
2018 phone call that Webb was "getting under his skin" and that

ACT needed to "handle it or else."  ECF No. 68-8 at 223-225.  In a text message to Montgomery and Scott Frein on the morning of March 5, 2019, Paine stated that WVDE "have also complied [sic, compiled] tweets and social media posts where Webb has sought to discredit the WVDE."  ECF No. 68-3.  In that same message, Paine complained of plaintiff's personal attacks against him, describing plaintiff as a "very shady dishonest lobbyist," and "as a constitutional officer I take [the personal attacks] very seriously. I suggest you take them seriously as well."  Id.  Paine testified that these comments were in response both to plaintiff's social media posts and to the hearsay rumor that plaintiff had accused Paine of receiving kickbacks.  ECF No. 68-4 at 158-59.  In another message, he said "I asked you on at least two occasions to work collaboratively with us and to hold Webb in check.  To date that has not happened."  ECF No. 68-3.

Of particular importance is the March 5, 2019 call between Paine and Marten Roorda, the CEO of ACT, in which Paine's comments could reasonably be understood as threats that ACT's status as a vendor could be impacted by plaintiff's social media posts and comments made while lobbying.  In an email sent by Roorda to Scott Montgomery shortly after the call, Roorda summarized the conversation as follows:

> I had a 20 min call with Mr. Paine, and his general counsel was also on the call.  Which surprised me, but was OK.  After going through some history he came to the issue.  He only addressed the role of Jason Webb, who he said has a bad reputation and insulted him for receiving a kickback fee from the CB [College Board].  I said I heard no complaints about Jason's behavior and from my position was not able to assess the situation.  I advised him to file a complaint with the Ethics Board.  Mr. Paine said he was still considering what action to take.  He also said that WV may be doing business with ACT in the future and indicated that the issue with Webb could have implications.  His counsel said that regulations for purchase practicing could effect the way they chose vendors and that Jason Webb's behavior may come close to actual slander.  I thought this was a sort of a threat.  And I don't like it.  I even think such a threat is illegal practice.

ECF No. 68-6.  ACT confirmed through Kratzer in its corporate deposition that the email was generated shortly after the call and that it has no reason to doubt the accuracy of the email. Kratzer Dep., ECF No. 68-7 at 168:1-168:8.

Throughout these communications, Paine appears to connect his grievances respecting plaintiff's speech with his official capacity in selecting vendors.  Importantly, these communications occurred while ACT was engaged in an ongoing and continuous attempt to have WVDE implement a local option. Though the threat is not made explicit, a reasonable fact finder could find that these messages were intended to convey the message to ACT that if they did not "hold Webb in check," as Paine demanded, possibly by pressuring Webb to delete posts or by terminating their contract with him, then ACT would face

adverse administrative consequences.  At the same time, these communications are such that a reasonable fact finder could find Paine's complaints to be mere expressions of frustration, stated adjacently to statements regarding ACT's status as vendor and WVDE's status as buyer, but nevertheless without the threatening intent that plaintiff contends they contain.  Indeed, Sarah Stewart testified that Paine was not making a threat on the call with Roorda, but instead just relating plaintiff's conduct to his employer.  Whether defendants' communications were a threat of imminent harm is disputed and material, precluding summary judgment.  This is the case even if there is no evidence that ACT yielded to such a threat.

The fact that defendants' communications, viewed in a light most favorable to plaintiff, were in the form of a demand to a third-party does not deprive plaintiff of "standing" to raise the communications, as defendants argue.  ACT kept plaintiff consistently apprised of these communications and the reasonable inference drawn by plaintiff was that he might suffer injury indirectly if he did not modify his speech, either by being fired or by his client losing its ability to provide services within the state.  See Webb Decl., ECF No. 72-1 at ¶¶ 7,8.  Thus, while defendants are correct in arguing that plaintiff could not establish standing based on threats to ACT's

pecuniary interests alone, he is free to assert his own injuries that flow from such threats, as he does here.

Whether defendants' conduct would have chilled a person of ordinary firmness in exercising their First Amendment rights is necessarily a fact-intensive inquiry, as the court must analyze "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." Suarez, 202 F.3d at 686.  The person we consider for the purposes of this analysis is a lobbyist of ordinary firmness whose client relies heavily on the contracting and regulatory decisions of a government agency.  See Blankenship v. Manchin, 471 F.3d 523 (4th Cir. 2006) (considering a "president of a company in a highly regulated industry" of ordinary firmness); Baltimore Sun, 437 F.3d at 419 (considering "reporters of ordinary firmness").

Defendants point the court to Baltimore Sun, in which the Fourth Circuit found that that the Governor of Maryland's directive ordering his employees not to speak to two reporters was a de minimis injury to the reporters' First Amendment rights.  437 F.3d at 420.  The court reasoned that because of the "rough and tumble" nature of the political arena, a reporter of ordinary firmness would not be chilled by a politician's decision to "den[y] the reporter access to discretionary

information." Id. at 419-20.  In reaching this conclusion, the court observed that reporters are generally used to currying favor with sources and that officials frequently seek out reporters who they believe will effectively deliver their messages to the public.  Id. at 417-18.  The court noted the plaintiffs' concession that the "daily successes and failures in obtaining [journalistic] access have an insignificant effect on reporting," and that the Governor's directive had not "created a chilling effect any different from or greater than that experienced by The [Baltimore] Sun and by all reporters in their everyday journalistic activities."  Id. at 419-20.  The court also observed that the plaintiffs had not presented evidence that they had themselves been chilled from exercising their rights.  Id. at 419.

    The present case is somewhat more analogous to Blankenship v. Manchin, which the Fourth Circuit handed down the year after Baltimore Sun.  471 F.3d 523.  The Fourth Circuit found, in affirming the district court, that a governor's threat to exercise greater administrative scrutiny over the plaintiff's coal company in retaliation for his public criticism of the governor's bond proposal amounted to an actionable chilling of free speech.  Id. at 525-27.  The Fourth Circuit emphasized that the governor's statements implied that plaintiff's company would

be treated differently from similarly situated companies despite the "presumption of regularity [that] attaches to administrative actions." Id. at 530. Distinguishing the case from a Tenth Circuit opinion, the court observed that the plaintiff "remained free" to criticize the governor, "but that would do little to minimize the damage from any actual adverse action taken against" his company. Id. at 532 (distinguishing Eaton v. Meneley, 379 F.3d 949, 956 (10th Cir. 2004)). The court also distinguished the case from Baltimore Sun, inasmuch as the plaintiff Blankenship had alleged that he had actually curtailed his speech in response to the threat, a relevant but non-dispositive factor in the objective analysis. Id. at 532.

If defendants' communications in this case presented ACT with the ultimatum of silencing plaintiff's criticism or losing future opportunities as a vendor with the WVDE, then that would rise above a de minimis injury to plaintiff's free speech rights. While it is expected that a lobbyist be tougher than an ordinary citizen in relation to the "rough and tumble" nature of politics, the threat of unfavorable treatment to a client in providing services within the state would chill a lobbyist of ordinary firmness. The WVDE, as a potential buyer of ACT's services on the statewide level and as regulator of ACT as a county-level service provider, had a great deal of power over

ACT directly and, consequently, plaintiff, indirectly.  A
presumption of regularity attached to WVDE's decisions in
exercising that power and that regularity is disturbed if an
official utilized that power to punish a lobbyist for his speech
or to get him to modify his commentary.  Paine, as a
decisionmaker within the WVDE, invoked his status as
"constitutional officer" and "customer" in communications with
ACT's leadership about plaintiff's social media activity.  Given
the substantial but indirect power defendants exercised over
plaintiff, as well as the potential severity of the alleged
threat to ACT, the adverse effect on plaintiff's First Amendment
rights is not <u>de minimis</u> as a matter of law.

     While the actions of plaintiff and of ACT after the
allegedly threatening communications are relevant to the
analysis, they are not dispositive of the ordinary firmness
inquiry.  <u>Constantine</u>, 411 F.3d at 500; <u>Blankenship</u>, 471 F.3d at
532 ("A chilling effect need not result in a total freeze of the
targeted party's speech.").  Plaintiff concedes that nobody from
ACT asked him to limit his Twitter posts on topics about
"education policy or education issues."  ECF No. 72-1 at ¶7.
However, plaintiff avers that in a phone conversation with
Kratzer, he was instructed to not specifically identify the WVDE
or its officials, including defendants, in those posts.  <u>Id.</u> at

¶6.  He indicates that out of fear for how ACT would be treated as a vendor, he agreed to not identify or mention the WVDE or its officials in social media posts on Twitter and deleted certain posts that he believed had upset defendants.  Id. at ¶¶ 7, 8.  Plaintiff indicates that he took Kratzer's entreaties to limit his social media posts as solely professional in nature rather than personal.  Id. at ¶¶ 9-11.

In sum, the challenged conduct here — the communications made by Paine to officials at ACT — could amount to a retaliatory action that adversely affected the plaintiff's constitutionally protected speech.  Whether that conduct amounted to a threat of unfair treatment to ACT as a vendor (and, in turn, the plaintiff), thereby making the conduct actionable, depends on the interpretation of those communications, which must be resolved by the trier of fact, rather than the court on summary judgment.  Moreover, whether the harm to plaintiff's free speech rights was more than de minimis similarly hinges on whether those communications amounted to a threat.

Standing

For reasons largely overlapping with the analysis of the second Suarez element, plaintiff has sufficiently demonstrated that he has standing.  To meet the Article III

standing requirement, "the party invoking federal court
jurisdiction must show that (1) it has suffered an injury in
fact, (2) the injury is fairly traceable to the defendants'
actions, and (3) it is likely, and not merely speculative, that
the injury will be redressed by a favorable decision." Long
Term Care Partners, LLC v. United States, 516 F.3d 225, 230–31
(4th Cir. 2008) (citing Lujan v. Defenders of Wildlife, 504 U.S.
555, 560–61, (1992)); see also Friends of the Earth, Inc. v.
Gaston Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000)
(en banc).  The rigid Article III standing requirements are
"somewhat relaxed in First Amendment cases" and "[t]he leniency
of First Amendment standing manifests itself most commonly in
the doctrine's first element: injury-in-fact." Cooksey v.
Futrell, 721 F.3d 226, 235 (4th Cir. 2013).

        The injury-in-fact prong is met by the showing of "an
invasion of a legally protected interest which is (a) concrete
and particularized and (b) actual or imminent, not conjectural
or hypothetical." Lujan, 504 U.S. at 560.  "In First Amendment
cases, the injury-in-fact element is commonly satisfied by a
sufficient showing of self-censorship, which occurs when a
claimant is chilled from exercising h[is] right to free
expression." Cooksey, 721 F.3d at 235 (internal quotation marks
omitted).  Plaintiff has demonstrated sufficiently at the

summary judgment stage that his speech was chilled and thus has suffered an injury-in-fact.  He avers that conduct attributable to defendants caused him to fear how his client would be treated by WVDE and because of that concern, he decided to not identify or mention the WVDE or its officials in social media posts on Twitter and deleted certain posts that he believed had upset defendants.  ECF No. 72-1 at ¶¶ 7,8.  This kind of chilling, for which plaintiff has shown a triable issue, represents an actual, particularized, and concrete invasion into his First Amendment rights.  The injury is fairly traceable to the allegedly retaliatory threats made by defendants and is likely to be redressed by a favorable decision of the court.

### c. Whether Plaintiff's Speech Caused Defendants' Allegedly Retaliatory Conduct

Finally, the third element of the claim is whether there was a causal connection between plaintiff's First Amendment activity and the defendants' conduct.  To demonstrate the causal connection, a plaintiff "must show, at the very least, that the defendant was aware of [plaintiff's] engaging in protected activity."  Constantine, 411 F.3d at 501 (citing Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998).  Additionally, "[t]here must also be some

degree of temporal proximity to suggest a causal connection."
Id.

The causal connection here, that is, whether
defendants' communications with ACT officials were caused by
plaintiff's protected activity, is plain and uncontroverted in
the evidence.  Defendants collected plaintiff's social media
posts and sent those posts to ACT with the apparent purpose of
having ACT do something about it.  Defendants also directly
contacted agents of ACT on other occasions to complain of
plaintiff's comments.  Moreover, the actions were close in time
to the protected activity.  Defendants have not raised an
argument that there is not a causal connection between
plaintiff's speech and defendants' conduct.  Therefore, summary
judgment in favor of plaintiff is appropriate with regard to the
third element.

## 2. Qualified Immunity

Defendants argue that they are entitled to dismissal
of plaintiff's claim of First Amendment retaliation based on
qualified immunity.  Given that the facts viewed in a light most
favorable to plaintiff establish the violation of a
constitutional right for purposes of defendants' motion for
summary judgment, the court now addresses whether that right was
clearly established at the time defendants allegedly violated

it.  The Supreme Court has instructed that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 201 (2001).  "[I]n determining whether a right has been specifically adjudicated or is manifestly apparent from broader applications of the constitutional premise in question, we may consider decisions of the Supreme Court, this Court, and the Supreme Court of Appeals of West Virginia." Blankenship, 471 F.3d at 533 (citation omitted).  "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." Meyers v. Baltimore County, Md., 713 F.3d 723, 731 (4th Cir. 2013).

Defendants argue that they are entitled to summary judgment as "it was entirely reasonable for Drs. Paine and Barth to believe it necessary to advise ACT of Plaintiff's conduct as it was misinformative and potentially detrimental to West Virginia students, teachers, and the WVDE's relationship with the state legislators, where schools receive their funding." ECF No. 71 at 29.  They support this position solely with Barth's testimony that she subjectively believed she had an "obligation" and "responsibility" to inform plaintiff's

supervisor of what she considered to be misleading posts.  Id.
(citing ECF No. 70-4 at 224:19-225:1).  They do not cite
supporting testimony by Paine.

Defendants have not met their burden in showing that
plaintiff's rights were not clearly established at the time of
injury.  The relevant inquiry on the "clearly established" prong
is an objective one, whether plaintiff's right, found to have
been violated, was clearly established based on applicable,
binding precedent.  Defendants do not explain how their supposed
responsibility to correct these social media posts might
overcome plaintiff's First Amendment rights and they present no
argument as to why it can be said that those First Amendment
rights were not clearly established at the time of the injury.

The Fourth Circuit has held that "[i]t is well
established that a public official may not misuse his power to
retaliate against an individual for the exercise of a valid
constitutional right."  Blankenship, 471 F.3d at 533 (quoting
Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir. 2001) (citing
Suarez, 202 F.3d at 685)).  The court in Blankenship found that
a plaintiff's First Amendment right to be free from adverse
regulatory action in retaliation for speech is violated by a
threat, coercion, or intimidation, intimating that punishment,
sanction, or adverse regulatory action will imminently follow.

Id.  "The specific right at issue here, the right to be free of threats of imminent, adverse regulatory action due to the exercise of the right to free speech, was clearly established by this Court in Suarez."  Id.  Defendants are not entitled to summary judgment based on qualified immunity.

## B. Count II: Tortious Interference with Business Relations

Plaintiff alleges in Count II that defendants tortiously interfered with his business relations with ACT.  ECF No. 1, ¶¶ 120-129.  To establish tortious interference with a contract or business relationship, a plaintiff must show (1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages.  Syl Pt. 5, Hatfield v. Health Mgmt. Assocs. of W. Va., 672 S.E.2d 395, 403 (W.Va. 2008) (quoting Syl. Pt. 2, Torbett v. Wheeling Dollar Sav. & Trust Co., 314 S.E.2d 166 (W.Va. 1983)).  As the Supreme Court of Appeals of West Virginia has explained:

> If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an

interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

Id. (quoting Syl. Pt. 2, Torbett, 314 S.E.2d 166).

Defendants argue principally that they are entitled to summary judgment because there is no evidence of a causal connection between defendants' conduct and plaintiff's loss of a business relationship or expectancy. Defendants emphasize the portion of ACT's corporate testimony in which it testified through Kratzer that Paine never requested that plaintiff be disciplined. See Kratzer Dep., ECF No. 70-2 at 142:6-12. Defendants also contend that the communications that defendants had with ACT played no part in ACT's decision to terminate the consulting agreement or to terminate its activities within West Virginia. See id. at 57:14-23.

Plaintiff, in his own summary judgment motion and in his response to defendants' motion, advances two arguments in relation to the third prong, that defendants' interference caused his loss. First, he argues that ACT's testimony is not conclusive of causation and that there is "circumstantial evidence" that defendants' conduct caused his loss of business with ACT.[2] Plaintiff points to the conduct considered above in

---

2 The court notes that, though not argued by defendants, the operative complaint, ECF No. 1, does not plead plaintiff's loss resulting from ACT's decision to terminate the contract, which occurred after the filing of the complaint.

relation to the second element of Count I, including Paine's text messages to ACT's leadership criticizing their failure "to hold Webb in check," Paine's call to the CEO of ACT, and Barth's email to ACT disparaging Webb.  Second, plaintiff argues that defendants' "pressure campaign" burdened his ability to perform on the contract, so that even if ACT's declination to continue the contractual relationship was unrelated to the pressure campaign, Paine and Barth still successfully impaired his contractual relationship.  In relation to this argument, he claims that he suffered added day-to-day burdens on his contractual performance prior to termination, damage to his reputation, and emotional distress and mental anguish because of defendants' allegedly tortious interference.

When asked why ACT exercised its contractual termination option, Kratzer, as ACT's corporate representative, testified, as earlier noted, that ACT decided to not continue its engagement in West Virginia for three reasons: the filing of this lawsuit by Webb, the "political landscape" changing in the West Virginia legislature, and the fact that ACT was "getting nowhere with the [WVDE] with regard to District Choice."  ECF No. 68-7 at 61:1-6.  Kratzer added, "[s]o when you take all those three things together, the decision was made not to move forward with our engagement in West Virginia."  Id. at 61:7-9.

Kratzer specifically testified that nothing Paine or Barth may have communicated with ACT regarding plaintiff had any part in ACT's decision to terminate the contract.  ECF No. 70-2 at 57. The evidence plaintiff presents, viewed in a light most favorable to him, does not show that defendants caused ACT to end the business relationship with plaintiff, even if it be found that defendants' communications were a threat of imminent harm.  Rather, it simply shows that defendants were frustrated with plaintiff's social media activity and repeatedly shared that fact in discussions with ACT representatives, with the aim of having ACT caution or temper plaintiff, or perhaps even terminate its contract with plaintiff.  While this may be evidence of an intentional act of interference by defendants, it is not evidence that such interference caused the termination of plaintiff's contract.

Plaintiff's claim that ACT's difficulty in getting the local option approved by WVDE, a stated reason for ACT's termination of the contract, may have been based on defendants' disapproval of his social media posts is not substantiated by any evidence presented.  Moreover, defendants have produced uncontroverted evidence that WVDE was engaged in a cooperative process with ACT to achieve local choice and that the process was voluntarily terminated by ACT through its email notice on

May 2, 2019, after running into obstacles in meeting U.S.
Department of Education requirements.  ECF Nos. 70-17 at 69-73,
70-53.  ACT's decision to withdraw came just five weeks after
Governor Justice's March 27, 2019 veto of SB 624, the local
option bill, and its decision to terminate its lobbying contract
with plaintiff came within one week of plaintiff's filing of
this action.  Indeed, Kratzer testified that ACT has not
employed an outside lobbyist in West Virginia since terminating
plaintiff.  ECF No. 70-2 at 70.  Thus, plaintiff has not shown a
material issue of fact supporting his claim that defendants
caused the termination of his relationship with ACT.  Rather,
ACT, having chosen to withdraw, had no further need for
plaintiff's lobbying services.

     Plaintiff's second argument, that defendants caused
not just the termination of the contract but also smaller,
continual injuries, is premised on §766A of the Restatement
(Second) of Torts, which has not been adopted by the West
Virginia Supreme Court of Appeals.  A number of courts, citing
to §766A, have recognized recovery of damages against a
defendant who makes plaintiff's performance of the contract more
burdensome or expensive.  Section 766A provides:

> One who intentionally and improperly interferes with the
> performance of a contract (except a contract to marry) between
> another and a third person, by preventing the other from
> performing the contract or causing his performance to be more

37

   expensive or burdensome, is subject to liability to the other
   for the pecuniary loss resulting to him.

Comment g of §766A explains that interference can be effected in

numerous ways, including performance being "made more expensive

to [the plaintiff], so that he loses all or part of the profits

that he would otherwise have obtained, or is subjected to a

financial loss."  This is in contrast with §766 of the

Restatement (Second), which requires that the improper

interference induce or cause the third party to not perform or

to breach the contract with plaintiff.  As the Third Circuit has

characterized it, §766 claims are "inducement torts," in that

the defendant induces a third party to act in a manner

detrimental to the plaintiff.  Windsor Securities, Inc. v.

Hartford Life Ins. Co., 986 F.2d 655, 660 (3d Cir. 1993).

Claims based on §766A are "hinder[ance] torts," meaning the

defendant hinders the plaintiff's performance of its obligations

to the third party.  Id.  The Windsor court explained that the

two Restatement sections embody "different effects and

justifications."  Id. at 661.

   The West Virginia Supreme Court of Appeals has not had

occasion to address whether a tortious interference claim may be

based on a theory of hinderance, rather than a theory of

inducement.  The Supreme Court of Appeals has "relied upon the

Restatement for guidance in outlining elements of and defenses

to improper interference but, of course, [is] not tied to its categories and definitions." _Torbett_, 314 S.E.2d at 172-73 (referencing Restatement (Second) §§766B, 766C, 767-772).  The Supreme Court of Appeals has also selectively relied on §766. _See_ _Tiernan v. Charleston Area Medical Center, Inc._, 506 S.E.2d 578, 591 n.20 (W.Va. 1998); _but see_ _Ferrell v. Rose_, 2011 WL 13364564 at *2 (W.Va. May 27, 2011) (declining to adopt Restatement (Second) §766 cmt. j).

Liability based on a hinderance theory has been recognized by a number of courts.  _E.g._, _Herman v. Endriss_, 446 A.2d 9, 10 (Conn. 1982); _Shafir v. Steele_, 727 N.E.2d 1140, 1143-44 (Mass. 2000); _Wilspec Technologies, Inc. v. Dunan Holding Group, Ltd._, 204 P.3d 69, 70 (Okla. 2009); _Magnum Radio, Inc. v. Brieske_, 577 N.W.2d 377, 379 (Wis. 1998).  Still, several courts and commentators have expressed skepticism about such liability.  _Price v. Sorell_, 784 P.2d 614, 616 (Wy. 1989); _Koehler v. County Grand Forks_, 658 N.W.2d 741, 748 (N.D. 2003); _White v. Ransmeier & Spellman_, 950 F.Supp. 39, 41 n.2 (D.N.H. 1996); _CMI, Inc. v. Intoximeters, Inc._, 918 F.Supp. 1068, 1079-80 (W.D.Ky.1995); 2 Dan B. Dobbs, _Law of Torts_ § 448 (2001).  In _Price_, the Wyoming Supreme Court declined to extend liability to hinderance torts as provided for in §766A, even though the court had previously relied on §§ 766 and 766B, finding that the mere

requirement to show performance became more "expensive or burdensome" would allow a plaintiff to recover where proof of damages is "too speculative and subject to abuse to provide a meaningful basis for a cause of action."  784 P.2d at 616.  The court contrasted §766A with §§ 766 and 766B, in which "breach or non-performance of a contract, or the loss of a prospective contractual relation, is a reasonably bright line that reduces the potential for abuse of the causes of action."  Id.

        The Third Circuit, interpreting Pennsylvania law, predicted, without holding, that the Pennsylvania Supreme Court would likely decline to adopt §766A, characterizing it as an "amorphous" expansion of liability that is "ill-conceived, threatening both fairness and efficiency."  Windsor, 986 F.2d at 663 (citing numerous commentators); see also CMI, Inc., 918 F.Supp. at 1079 ("The actual language of §766A is so all encompassing and vague that to adopt it directly would cause tremendous confusion without creating a clear societal benefit.").  The Third Circuit subsequently affirmed a trial court's dismissal of a §766A claim, reasoning that it is "too speculative and subject to abuse to provide a meaningful basis

for a cause of action." _Gemini Phys. Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co._, 40 F.3d 63, 66 (3d Cir.1994).[3]

This court can only speculate as to whether the West Virginia Supreme Court of Appeals would follow the tort theory embodied in §766A of the Restatement (Second). "A federal court acting under its diversity jurisdiction should respond conservatively when asked to discern governing principles of state law." _Rhodes v. E.I. du Pont de Nemours & Co._, 636 F.3d 88 (4th Cir. 2011) (declining to predict whether the West Virginia Court of Appeals would adopt certain Restatement (Second) provisions); _see_ _Time Warner Entertainment v. Cavaret-Craven Elec. Membership Corp._, 506 F.3d 304, 315 (4th Cir. 2007) ("[A]s a court sitting in diversity, we should not create or extend [state] common law."); _see also_ _Anderson v. Marathon Petroleum Co._, 801 F.2d 936, 942 (7th Cir.1986) ("[F]ederal court is not the place to press innovative theories of state law."). When federal courts are "faced with opposing plausible interpretations of state law, we generally choose the narrower interpretation which restricts liability, rather than the more

---

3 The lower state courts of Pennsylvania have not uniformly followed the Third Circuit's reasoning. _Compare Biofeedback Grp., Inc. v. State Farm Mut. Auto. Ins. Co._, 1996 WL 1358442 (Pa.Ct.Com.Pl. 1996) (agreeing with the Third Circuit's rationale) _with P.V.C. Realty ex rel. Zamias v. Weis Markets_, 2000 WL 33406981, at *16–17 (Pa.Ct.Com.Pl. Dec. 19, 2000) (recognizing a claim under §766A).

expansive interpretation which creates substantially more liability." Birchler v. Gehl Co., 88 F.3d 518, 522 (7th Cir. 1996). Plaintiff's second argument for surviving summary judgment is predicated on a broad expansion of liability under West Virginia state law and there are few, if any, indications given by the Supreme Court of Appeals that it would take that path if presented with the question. Consequently, plaintiff's second argument fails, and summary judgment should be granted as to Count II — Tortious Interference with Contract.[4]

C. Count III: Civil Conspiracy

In Count III, plaintiff claims that defendants were engaged in a conspiracy to violate his First Amendment rights and tortiously interfere with his business relationship with ACT. ECF No. 1 at ¶¶ 130-36. "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." Syl. Pt. 3, Jane Doe-1 v. Corp. of President of The Church of Jesus Christ of Latter-day Saints, 801 S.E.2d 443 (W. Va. 2017) (quoting Syl.

---

4 Defendants also argue that they are entitled to summary judgment on Count II based on the affirmative defenses that their conduct was legally justified or privileged, as well as the application of state qualified immunity. The court need not reach these arguments.

Pt. 8, <u>Dunn v. Rockwell</u>, 689 S.E.2d 255 (2009)).  Civil
conspiracy is not an independent basis for recovery but instead
a doctrine for assigning liability to "people who did not
actually commit a tort themselves but who shared a common plan
for its commission with the actual perpetrator(s)."  Syl. Pt. 4,
<u>Id.</u> (quoting Syl. Pt. 9, in part, <u>Dunn</u>, 689 S.E.2d 255).

Because the right to recover for civil conspiracy is
derivative of the underlying claim, summary judgment in favor of
defendants is warranted insofar as it relates to civil
conspiracy to tortiously interfere with plaintiff's business
relations.  <u>See</u> <u>Bennett v. Skyline Corp.</u>, 52 F.Supp.3d 796, 814
(N.D. W.Va. 2014) ("Courts have granted summary judgment or
dismissal as to claims of civil conspiracy when there is no
underlying tort to support the claim.").  Similarly, as it
relates to civil conspiracy to violate plaintiff's First
Amendment rights, there remains a genuine issue of material fact
regarding the underlying First Amendment retaliation claim, and
thus neither party is entitled to summary judgment on the issue
of whether the underlying conduct was unlawful.

Thus, the sole remaining inquiry is whether there is a
genuine issue of material fact as to whether defendants'
underlying conduct giving rise to the First Amendment claim was
concerted.  Plaintiff argues that Barth was a "partner and

conduit through which Paine directed and implemented the campaign of retaliation and interference against Webb." Communications between Paine and Barth show that they discussed their mutual feeling that plaintiff's posts were frustrating and duplicitous, and that he was undermining their work at WVDE. Paine testified that he met with Barth to discuss Webb's "tweets and posts" and he directed her to have someone compile those posts. Those posts were discussed in Paine's communications with ACT representatives and the CEO of ACT.

Defendants do not contest the above evidence or present an argument for why it would not amount to concerted action, except to deem these facts "mere speculation, relationship, or association." ECF No. 74 at 15 (quoting Brown v. Kerkhoff, 504 F.Supp.2d 464, 526 (S.D. Ia. 2007)) (internal modifications omitted). A reasonable trier of fact which found that defendants' conduct amounted to First Amendment retaliation could also find that defendants' conduct was done in concert. The evidence demonstrates that Paine and Barth felt similarly about the social media posts and Barth's acts of collecting social media posts and contacting ACT officials furthered the alleged retaliation against Webb. Therefore, neither party is entitled to summary judgment as to whether the defendants acted

in concert as charged in Count III insofar as it relates to the First Amendment retaliation claim.

### IV.  Conclusion

It is accordingly ORDERED that:

1. Plaintiff's motion for summary judgment be, and it hereby is, granted as to the first and third elements of Count I.

2. Plaintiff's motion for summary judgment, be and it hereby is, denied as to Counts II and III, as well as the second element of Count I.

3. Defendants' motion for summary judgment be, and it hereby is, granted as to Count II, and to Count III to the extent Count III is based on civil conspiracy to tortiously interfere with plaintiff's business relationship.

4. Defendants' motion for summary judgment be, and it hereby is, denied as to Count I, and Count III to the extent Count III is based on civil conspiracy to violate plaintiff's First Amendment rights.

The Clerk is directed to transmit this memorandum opinion and order to all counsel of record.

ENTER: January 26, 2021

John T. Copenhaver, Jr.
Senior United States District Judge